Wei ZHANG, Plaintiff–Appellee,

v.

AMERICAN GEM SEAFOODS, INC., Delaware corporation; MCMI Food Company, a Texas corporation; Harry Lees, a natural person, Defendants–Appellants.

No. 01–36130.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted April 10, 2003.

Filed Aug. 7, 2003.

Katharine Cooper Franklin and Leigh Ann Collings Tift, Littler Mendelson, PC, Seattle, WA, Janet Hugie Smith and Fred-

erick Thaler, Ray Quinney & Nebeker, Salt Lake City, UT, for the defendants-appellants.

Scott C.G. Blankenship, Robert A. Dunbabin, Jr., The Blankenship Law Firm, Seattle, WA, for the plaintiff-appellee.

Before: D.W. NELSON, THOMAS, Circuit Judges, and PREGERSON,[*] District Judge.

D.W. NELSON, Senior Circuit Judge.

Appellee Zhang Wei ("Zhang")[1] asserted claims for employment discrimination and breach of contract, contending that he was retaliated against and ultimately fired due to his Chinese ethnicity and nationality. He sued his former employer, appellant American Gem Seafoods, Inc. ("American Gem"), American Gem's corporate parent, appellant MCMI Food Company ("MCMI" and, together with American Gem, the "corporate defendants"), and MCMI's president, appellant Harry Lees, in federal district court. A jury found the corporate defendants liable for discrimination under federal law, awarding both compensatory and punitive damages, and found the corporate defendants and Lees liable for breach of contract, awarding lost wages and wages willfully withheld. All of the defendants appealed. We affirm the district court's entry of judgment on the jury's verdict.

*FACTUAL BACKGROUND*

The factual recitation herein is taken from the evidence presented to the jury.

Zhang Wei, formerly a professor of business and a proponent of Western economic systems at Northeastern University in Dalian, China, came to the United States in 1990 due to the political crackdown following the Tiananmen Square massacre. After finishing his MBA at Delaware State University, he began working in the seafood industry, eventually becoming the vice president of SeaRich Seafoods and general manager of SeaRich West, based near Seattle.

In September 1997, MCMI formed American Gem as a subsidiary to take over SeaRich Seafoods and several other seafood companies. Zhang was hired to join American Gem after the takeover; according to his employment contract, which was signed by Al Reitzer, then president of American Gem, Zhang's position was vice president of American Gem and general manager of its Pacific Gem division. Zhang testified that although his division was integral to the new company's operations, he was initially offered a lower salary than the Caucasian vice presidents of the acquired companies. He held out for equal compensation, and eventually American Gem agreed. In October 1998, Zhang was promoted to president of the Pacific Gem division, and a 1998 American Gem publication listed Zhang as "responsible for all seafood procurement from China and other Asian countries."

In December 1997, appellant Harry Lees was hired as president and CEO of MCMI. Lees took a direct role in the management of American Gem, superseding Reitzer; Lees asked Reitzer to step aside as president of American Gem, and Reitzer appointed James Mullin as president in the spring of 1998. In November

---

[*] The Honorable Dean D. Pregerson, United States District Judge for the Central District of California, sitting by designation.

1. Zhang's name is found in the record as both Zhang Wei, according to the Chinese practice of placing the surname before the given name, and Wei Zhang.

1998 Lees hired a new management team that included Clair Parker and Jim Bugbee. Mullin left American Gem shortly thereafter and Lees forced Reitzer to resign in December 1998. Parker then became president of American Gem, and Bugbee became a vice president. Also around this time, Jim Hilger was hired as the Chief Financial Officer of American Gem.

Zhang presented evidence that he was discriminated against by American Gem's management, especially the new management team. Witnesses testified that Lees told them that he distrusted Zhang because he was Chinese, that Lees did not like Chinese people and made derogatory comments about them, and that Lees suspected that Zhang was "looking out for his Chinese friends' interests at the expense of our company." Another Chinese employee, Parker Gao, testified that Zhang was generally treated worse than American Gem's white employees.

Zhang was sidelined in the management of American Gem. Although Zhang was a vice president and had previously reported directly to the American Gem president, he was now required to report to the new management team, including CFO Hilger and fellow vice president Bugbee, and he was excluded from management meetings. He had previously been in charge of all Asian operations, but his new business card listed him as Vice President, China Operations. This new description apparently reflected a demotion. No one told him why.

Industry publications, which apparently got their information from American Gem, also omitted Zhang's name from lists of managers. One referred to six managers in American Gem's "new Seattle-based management team," including Parker, Bugbee, and Hilger, but not Zhang. Another publication, dated February 1, 1999, omitted Zhang from a list of officers, vice presidents, and managers of American Gem—a list that showed Bugbee as the Vice President for Asian Procurement—and stated that American Gem's "management has been completely replaced." Zhang testified that many of his suppliers were confused by this and called him to see whether he was still with the company.

Zhang presented evidence that he worked hard and that he brought in profits for American Gem. In addition to the Pacific Gem division, Zhang worked with an office in Dalian, China, Zhang's hometown. Zhang often worked from 6:30 a.m. until midnight to stay in contact with operations both on the East Coast and in China. Reitzer, Zhang's former supervisor, testified that Zhang was a dedicated and tireless worker.

Zhang's division, Pacific Gem, was the only profitable division in the company, and Zhang had the highest sales of any American Gem employee in 1998. Although he was entitled to a $25,000 bonus under his contract, he was never paid one for 1998. Lees testified that Zhang did not receive a bonus because although the Pacific Gem division was profitable, American Gem as a whole was not. Nonetheless, after Zhang was terminated, Bugbee, who is Caucasian, received a bonus for 1999 even though American Gem was unprofitable that year. Zhang also testified that the Dalian office's expenses were not paid by American Gem while he was in charge.

Zhang never received any antidiscrimination policy literature or training while he worked at American Gem and was not informed about how to make a discrimination complaint. Mullin, American Gem's president during 1998, testified that there was "no real [antidiscrimination] policy" during the time that American Gem was formed.

In February 1999, Zhang took a trip to Iceland along with two former American

Gem employees. They met with people at Atlantic Coast Fisheries, and Zhang handed out his Pacific Gem business card. Zhang told the company that he was taking a personal vacation with his father—his first vacation since starting work at SeaRich Seafoods—and used his vacation time for the trip. Upon his return from Iceland on February 24, 1999, he was met by Parker and Hilger as he exited Customs at Boston's Logan Airport, and they told him in a loud voice that he was terminated. When he asked why, they told him that he could go back to Seattle to find out. No one asked him why he had gone to Iceland. Cynthia Diaz, an attorney who worked for MCMI's parent company, told Zhang that he was fired for going to Iceland with competitors. At trial, however, Lees testified that, at the time Zhang was terminated, no one knew why he had made the trip. Several months after he was terminated, and after repeatedly requesting an explanation, Zhang received a letter from Diaz stating that in addition to the Iceland trip, he was terminated because he violated a directive against extending credit, refused to provide documentation of transactions in China, and was insubordinate to Lees. None of these accusations was substantiated at trial.

Zhang also presented evidence that, in comparison to Caucasian employees who had been terminated, he was treated unfavorably during and after his termination. He was terminated publicly without any chance to respond to any allegations of wrongdoing and without so much as a word of explanation. His company car was immediately confiscated, and his personal effects were held by American Gem. After termination, he did not receive any salary, expense reimbursements, accrued vacation time, or medical benefits. Finally, American Gem sent letters, written in English and Chinese, to his suppliers in China stating that he no longer worked for them.

In contrast, other former employees of American Gem, all Caucasian, had not been fired immediately or publicly and in most cases had been allowed to resign. They had been given severance packages and had continued to receive salary and benefits after termination. One employee who had a company car was allowed to keep it for six weeks after termination. Some of these employees were terminated for cause, including two who were basically stealing from the company and one who allegedly exposed himself to his coworkers. None said that American Gem sent out letters to their business contacts notifying them of the termination.

When Zhang was fired, Bugbee came to the company's Seattle office and confiscated the keys of American Gem employees Parker Gao and Stacy Li, who are Chinese. Bugbee then assumed Zhang's former title and responsibilities as Vice President for Asian Procurement, although he was not able to get the same favorable terms in China that Zhang had gotten. And, as noted above, Bugbee received a bonus for his performance in 1999.

*Procedural Background*

Zhang brought suit in federal district court in September 1999; jurisdiction was premised on allegations of employment discrimination in violation of 42 U.S.C. § 1981. Zhang also alleged discrimination in violation of the Washington Law Against Discrimination, Wash. Rev.Code ch. 49.60, breach of contract in violation of Washington law, and willful withholding of wages and benefits under Washington law.

The jury returned a mixed verdict for Zhang. Although it rejected his hostile work environment, retaliatory discharge, and state-law discrimination claims, it found that the corporate defendants—but not Lees—were liable for federal-law discrimination under § 1981 and that all de-

fendants were liable for breaching Zhang's employment contract. On the § 1981 claim, the jury awarded $360,000 in compensatory damages and $2,600,000 in punitive damages. On the breach of contract claim, the jury awarded $86,000 in lost wages. Because Washington law allows double damages for willful withholding of wages, *see* Wash. Rev.Code §§ 49.52.050(2), 49.52.070, the jury was also asked how much of Zhang's wages were willfully withheld; the jury answered with the figure $87,500.

Immediately recognizing that the jury's verdict was apparently inconsistent because it had awarded more in double damages than in base damages, the trial court ordered briefing on what should be done. In response, the defendants argued not only that this discrepancy created an inconsistency requiring vacation of the jury's verdict, but also that the jury's split verdict—finding liability for the corporate defendants but exonerating Lees—was inconsistent. The court characterized the defendants' brief as a motion for new trial and allowed Zhang to respond. The court then orally denied the motion. As to the discrepancy in lost wages, the court reasoned that, at most, the defendants would only be entitled to a new trial on damages for that issue, but that any error was cured by Zhang's stipulation to remittitur of the $87,500 figure to $86,000. As to the split liability finding, the court found that there was substantial evidence in the record that persons other than Lees took adverse actions against Zhang, including firing him.

The defendants then filed another motion for new trial and judgment as a matter of law (JMOL).[2] The defendants re-

newed their argument that the evidence did not support the corporate defendants' liability without Lees's liability, and also argued that Lees could not be held personally liable for breach of contract, that there was no evidence to justify instructing the jury on punitive damages, that the evidence did not support the compensatory damage award, and that the punitive damage award was excessive. The district court denied the motion, and the defendants appealed, raising mostly the same issues that were the subject of the posttrial motions as well as evidentiary and instructional issues.

### DISCUSSION

#### I. The district court's exclusion of the purported antidiscrimination policy

■ The only evidentiary ruling challenged by the appellants is the trial court's exclusion of an antidiscrimination policy that was purportedly applicable to American Gem. We review the decision to exclude evidence for abuse of discretion, *see Tremain v. Bell Indus., Inc.*, 196 F.3d 970, 976 (9th Cir.1999), and we find none here.

The purported antidiscrimination policy is part of a document entitled "Quick Reference Guide on Policies/Procedures for Mission City Management, Inc." The specific policy is found under the heading "Sexual Discrimination / Harassment" and makes one reference to race: "Mission City Management, Inc. prohibits harassment based on race, color, religion, sex national origin [sic], age, disability or veteran status." The defendants attempted to admit the document during Lees's trial testimony to demonstrate that the corpo-

---

**2.** Historically, a motion for JMOL submitted at the close of all the evidence has been known as a motion for a "directed verdict," and a motion for JMOL submitted after the jury's verdict is returned has been known as a

motion for "judgment notwithstanding the verdict" (JNOV, after the Latin *non obstante veredicto*). *See* Fed.R.Civ.P. 50 advisory committee's note.

rate defendants had an antidiscrimination policy.

The district court excluded the document for several reasons. Because Mission City Management, Inc., although related to MCMI Food Company, is a separate company and was not a defendant,[3] the district court initially held that there was no foundation establishing that the document was the policy of the corporate defendants. After Lees testified that he had established this policy as the policy of MCMI, the court excluded the document because it was undated and unsigned, it was not produced in discovery, and there was no evidence that it had been "seen by anyone at Pacific Gem."

■ The district court did not abuse its discretion in excluding the document as a discovery sanction. The appellants concede that the policy was not produced to Zhang until after the discovery cut-off date and after Lees's deposition. The only basis for nondisclosure given by counsel at trial was that "there was a rash of discovery when we were involved in the case," and no additional reasons have been given in the briefing before this Court. This does not constitute a "substantial justification" for not disclosing this document, and in the absence of such a justification the district court may validly exclude, as a discovery sanction, evidence not produced in discovery. Fed.R.Civ.P. 37(c)(1).

■ Alternatively, the district court did not abuse its discretion in excluding the evidence for lack of foundation. In order for the document to be relevant to this case, see Fed.R.Evid. 401, the defendants would have had to establish that it actually reflected the policy of Pacific Gem, American Gem, or MCMI, and there was no

competent evidence that it had in fact been distributed to the managers or employees of any of these entities. Although Lees testified that the policy had been distributed, he also testified that others performed the distribution, and there is no evidence that he had personal knowledge that employees received the policy. Furthermore, at trial, the defendants stipulated to the fact that American Gem never provided Zhang "with a company policy or handbook prohibiting discrimination or harassment." The district court's conclusion that Lees's testimony was insufficient to provide a foundation for this document was not an abuse of discretion.

## II. Lees's personal liability for breach of contract

■ The jury found both Lees and the corporate defendants jointly and severally liable for breach of Zhang's employment contract, following instructions and a verdict form that expressly allowed such a result. The appellants argue that, contrary to the jury's verdict, Lees could not be held liable for breach of Zhang's employment contract because he was not a party to that contract. We hold that the appellants have waived this issue.

As counsel conceded at oral argument, the appellants did not raise this issue until after the verdict was returned. They did not propose jury instructions that would have excluded Lees from liability, nor did they move for JMOL on Lees's liability at the close of the evidence. Only in their post-trial motion for a new trial and for JMOL did they argue that Lees could not be held liable.

■ The failure to raise this issue prior to the return of the verdict results in a complete waiver, precluding our consider-

---

**3.** The record reflects that Mission City Management, Inc., was originally named as a defendant, but the district court later allowed

substitution of MCMI Food Company as the proper defendant pursuant to Federal Rule of Civil Procedure 15(c)(3).

ation of the merits of the issue. Federal Rule of Civil Procedure 50 requires that a motion for JMOL be made at the close of all the evidence in order to be renewed following entry of judgment. This Court strictly applies the rule that Rule 50 allows complete waiver if an objection is not properly made. *See, e.g., Janes v. Wal–Mart Stores, Inc.,* 279 F.3d 883, 887 (9th Cir. 2002) (refusing to review an issue even where it was raised in a Rule 50(b) motion after trial because " 'the requirement that [a JMOL] motion be made at the close of all the evidence is to be strictly observed' ") (quoting *Farley Transp. Co. v. Santa Fe Trail Transp. Co.,* 786 F.2d 1342, 1346 (9th Cir.1986)). The district court therefore properly denied the appellants' post-trial motion.

*III. Jury instructions on federal and state law discrimination*

■ The jury instructions given by the district court for discrimination under § 1981 and under Washington law were substantially identical, differing only in that the federal law instruction required Zhang to show that his race was a "motivating factor" in the adverse employment action, while the state law instruction required him to show that his race was a "substantial factor." Both instructions also stated that Zhang was "not required to prove that his race or national origin was the only factor or the main factor" in the adverse action. The appellants proposed additional instructions on the meaning of "motivating factor" and "substantial factor," and appeal the district court's rejection of these instructions. Reviewing the district court's decision for abuse of discretion, *Masson v. New Yorker Maga-*

*zine,* 85 F.3d 1394, 1397 (9th Cir.1996), we find no error.

■ The general rule is that "the district court need not define common terms that are readily understandable by the jury." *United States v. Hicks,* 217 F.3d 1038, 1045 (9th Cir.2000) (collecting cases discussing terms that need not be defined, including "commercial advantage," "private financial gain," "violence," "organizer," "supervisor," and "manager"). The "motivating factor" instruction given conforms to the model federal instructions in § 1981 cases where both legal and illegal motives may be present: The jury should find for the plaintiff if it finds "by a preponderance of the evidence that race was a motivating factor, even though other factors also motivated the practice." Modern Fed. Jury Instr. Form Instr. 87–22AA (2002). The instruction also conforms to the model Ninth Circuit instructions, whose commentary expressly notes that "[t]he term 'motivating factor' may not require definition because of its common usage." 9th Cir. Civ. Jury Instr. 12.1 cmt. (2002). The appellants cite no cases in which this term has been explained, and we have recently read equivalent jury instructions to be adequately precise. *See, e.g., Costa v. Desert Palace,* 299 F.3d 838, 858 (9th Cir.2002) (en banc), *aff'd,* —— U.S. ——, 123 S.Ct. 2148, 156 L.Ed.2d 84 (2003) (noting that in sex discrimination case, jury was instructed, apparently without further definition, that "[i]f you find that the plaintiff's sex was a motivating factor in the defendant's treatment of the plaintiff, the plaintiff is entitled to your verdict, even if you find that the defendant's conduct was also motivated by a lawful reason").[4] While it might have been prudent

---

4. The term "motivating factor" is also routinely not defined in several other contexts. *See Lambert v. Ackerley,* 180 F.3d 997, 1008 (9th Cir.1999) (en banc), *cert. denied,* 528 U.S. 1116, 120 S.Ct. 936, 145 L.Ed.2d 814 (2000), (noting that in Fair Labor Standards Act case,

jury was instructed that one element was "[t]hat the protected activity was a substantial motivating factor in the adverse employment action"); *Sloman v. Tadlock,* 21 F.3d 1462, 1471 (9th Cir.1994) (approving, in First

for the district court to elaborate on this term, it was not an abuse of discretion not to do so.

As for the "substantial factor" language, the court's instruction likewise conforms to Washington's pattern instruction:

> To recover, plaintiff has the burden of proving that [his][her] [race] [sex][age] [religion] [national origin] [marital status] was a [significant or] substantial factor in defendant's decision [to terminate][not to promote] [not to hire] [lay off][him][her]. Plaintiff does not have to prove that [race] [sex] [age] [religion] [national origin] [marital status] was the only factor or the main factor in the decision, or that plaintiff would have been [retained] [hired] [promoted] but for [his][her] [race ][sex][age] [religion] [national origin] [marital status].

6A Wash. Prac., Wash. Pattern Jury Instr. Civ. WPI 330.01 (4th ed.2002). Neither the pattern instruction nor the commentary suggests that a definition of "substantial factor" is necessary. The Washington Supreme Court has noted, without disapproval, that trial courts have used jury instructions that conform to the pattern instructions and do not define "substantial factor." *See Delgado Guijosa v. Wal-Mart Stores, Inc.,* 144 Wash.2d 907, 32 P.3d 250, 254 (Wash.2001). The district court did not abuse its discretion in failing to define this term for the jury.

■ The appellants contend that the district court erred in rejecting its instructions because the terms "motivating factor" and "substantial factor" are equivalent, and that they were entitled to an instruction equating the two. This argument fails for the simple reason that they never sought such an instruction; the rejected instructions only elaborated on the meanings of these terms. Under the Federal Rules of Civil Procedure, in order to preserve objections against jury instructions, a party must "stat[e] distinctly the matter objected to *and the grounds of the objection.*" Fed.R.Civ.P. 51 (emphasis added); *see Hammer v. Gross,* 932 F.2d 842, 847 (9th Cir.1991) (en banc) (noting that the Ninth Circuit "has enjoyed a reputation as the strictest enforcer of Rule 51"). The appellants never objected on the grounds that the standards should be identical, nor did they assert that if they were exonerated from liability under one law, they must be exonerated under the other as well. They have waived any argument that the instructions should have equated these two terms.

## IV. Allegedly inconsistent verdicts

At the heart of this appeal is the appellants' argument that the verdict returned by the jury is irreconcilably inconsistent. According to the appellants, three elements of the jury verdict are inconsistent: first, that the jury found the corporate defendants liable for discrimination but found Lees not liable; second, that the jury found the corporate defendants liable for discrimination under § 1981 but not under Washington law; and third, that on the breach of contract claim the jury awarded more in double damages than it had awarded in damages for the same claim. Although these alleged inconsistencies present several intersecting legal issues, we conclude that none of them is cause to vacate the judgment or to order a new trial.

Amendment context, instruction that jury "must find that the plaintiff's protected [activity] ... was a motivating factor in the defendants' decisions"); *Los Angeles Police Protective League v. Gates,* 995 F.2d 1469, 1474 (9th Cir.1993) (noting that, in Fourth Amendment context, jury had been instructed that "plaintiff must show by a preponderance of the evidence that his lawful refusal to obey the search order was a 'substantial factor' or a 'motivating factor' in the defendants' decision to terminate him").

### A. General and special verdicts

As an initial matter, and one that is not inconsequential to the legal analysis of these claims, the parties disagree as to the nature of the verdicts at issue. The Federal Rules of Civil Procedure explicitly contemplate two types of verdicts, special verdicts, *see* Fed.R.Civ.P. 49(a), and general verdicts with interrogatories, *see* Fed. R.Civ.P. 49(b), and implicitly contemplate common law general verdicts without interrogatories. Both special verdicts and interrogatories comprise only factual findings; a special verdict is "in the form of a special written finding upon each issue of fact," Fed.R.Civ.P. 49(a), and interrogatories are returned "upon one or more issues of fact the decision of which is necessary to a verdict," Fed.R.Civ.P. 49(b).

 The Federal Rules do not define general verdicts, but they imply that general verdicts do not involve factual findings but rather ultimate legal conclusions. *See id.* This view is of course consistent with the common law and our own caselaw; in *Floyd v. Laws*, 929 F.2d 1390 (9th Cir. 1991), we held that the theoretical distinction between general and special verdicts is that general verdicts require the jury to apply the law to the facts, and therefore require legal instruction, whereas special verdicts "compel the jury to focus exclusively on its fact-finding role." *Id.* at 1395. Black's defines a general verdict as "[a] verdict whereby the jury find either for the plaintiff or for the defendant in general terms." Black's Law Dictionary 1560 (6th ed.1990). Thus in a general verdict the jury announces only the prevailing party on a particular claim, and may announce damages.

 A jury may return multiple general verdicts as to each claim, and each party, in a lawsuit, without undermining the general nature of its verdicts. *See, e.g.,* 9A Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure

§ 2504.1 (2d ed. Supp.2003) ("In cases involving multiple claims ... or defendants, the district court may ... have the jury render multiple general verdicts."). Although some general verdicts are more general than others, encompassing multiple claims, the key is not the number of questions on the verdict form, but whether the jury announces the ultimate legal result of each claim. If the jury announces only its ultimate conclusions, it returns an ordinary general verdict; if it makes factual findings in addition to the ultimate legal conclusions, it returns a general verdict with interrogatories. If it returns only factual findings, leaving the court to determine the ultimate legal result, it returns a special verdict.

These terms are not adequate to capture every answer that a jury may give. In addition to the ultimate legal conclusion in a case, a jury may make legal conclusions as to subsidiary issues, such as affirmative defenses, or the amount of damages owed, which are neither findings of fact nor quite "verdicts." Such answers are similar in kind to general verdicts, because they require application of the law to the facts, but we have found no precise label for them.

In this case, the jury returned general verdicts, with separate determinations as to damages, for nearly every claim, making virtually no factual findings. Of the thirteen questions on the verdict form, eleven were either of the form "Do you find for [the] plaintiff?" or "What total amount of [damages] [punitive damages] [lost wages] do you award?" All of the discrimination claims were disposed of by such questions; therefore, each of the alleged inconsistencies in the discrimination claims arises between two general verdicts.

The only area in which the jury made factual findings relates to double damages. After finding that the defendants were lia-

ble for lost wages on Zhang's breach of contract claim, the jury was asked two questions: "Do you find that any wages or benefits were willfully withheld with intent to deprive plaintiff of wages or benefits required by the contract?" and "What amount of wages or benefits were willfully withheld during the period from the date of termination until September 29, 1999?" On this one issue the jury returned a special verdict, leaving to the trial court the duty to apply the law and determine that Zhang was entitled to double damages for all wages and benefits willfully withheld. With respect to double damages, therefore, the appellants allege an inconsistency between a subsidiary legal conclusion (the award of damages for breach of contract) and one of the factual findings in a special verdict (the amount of wages willfully withheld).

### B. *Inconsistencies between legal conclusions*

■ We contemplate three ways in which legal conclusions such as general verdicts might be alleged to be inconsistent: the jury might disregard instructions requiring two general verdicts to be harmonious; the jury might return a general verdict that, under the facts of the case, implies a lack of evidence underlying another general verdict; or the jury might return two general verdicts that, under any facts, seem to be legally irreconcilable. The latter two situations are presented here. In the split verdict between the corporate defendants and Lees on the § 1981 claim, the appellants claim that although it is legally possible for a corporation to be held liable for discrimination while its agent is exonerated (because, among other reasons, the corporation may have acted through other agents), in this case there was no evidence that anyone other than Lees committed any discriminatory acts, and thus the verdict fails for insufficient evidence. As to the discrepancy between the federal and state discrimination claims, the appellants argue that these claims are legally indistinguishable under any set of facts and thus that no rational jury could find liability on one and not the other claim.

### 1. *Sufficiency of the evidence*

■ The appellants' sufficiency of the evidence argument fails because it was not raised before the close of all the evidence.[5] The appellants made a post-verdict motion for JMOL based on insufficiency of the evidence, but failed to meet the ordinary requirement that a motion for JMOL must first be brought at the close of all the evidence. *See* Fed.R.Civ.P. 50(b); *Janes*, 279 F.3d at 887.

The appellants suggest that the ordinary waiver rules for JMOL do not apply here because the sufficiency of the evidence issue arose only due to the jury's split liability findings, relying upon *Pierce v. Southern Pacific Transportation Co.*, 823 F.2d 1366 (9th Cir.1987). In *Pierce*, we held that where a jury had returned a special verdict, a challenge to the consistency of its answers could be raised in a post-verdict motion for JMOL even though no pre-verdict motion had been made. *Id.* at 1369. But *Pierce* was specifically limited to the context of a special verdict, and inapplicable to a case such as this in which the jury returned a general verdict:

> [J]ust as a motion for directed verdict is not required to preserve the question

**5.** Our discussion is not intended to imply that, were we to review the verdict for sufficiency of the evidence and search for evidence of discrimination other than Lees's conduct, we would find such evidence lacking. The facts set out above include several lines of evidence apart from Lees's actions suggesting that Zhang was fired due to his race or national origin.

whether a judgment is supported by the jury's special verdict, a motion for directed verdict need not be a condition precedent for JNOV when the challenge is to the consistency of answers under a Rule 49(a) special verdict, *and not to the sufficiency of evidence supporting a general verdict.*

*Id.* (emphasis added).

A close analysis of *Pierce* demonstrates that although our inquiry was styled as a review of the consistency of the special verdict answers, it really was indistinguishable from review of whether the special verdict answers supported the judgment of the trial court. The basic issue in *Pierce* was whether, under the facts of that case, a particular factual finding nullified the defendant's liability, regardless of any other factual findings that might suggest that the defendant was liable. *See id.* at 1370 (noting that the defendant's view was that one of the jury's findings negated its negligence "as a matter of law"). Thus the real question was whether the jury's factual findings required judgment for the plaintiff or the defendant, a question that is simply irrelevant where, as here, no factual findings are at issue.

The inapplicability of *Pierce* to general verdicts is demonstrated by subsequent Ninth Circuit caselaw. In *Vaughan v. Ricketts,* 950 F.2d 1464 (9th Cir.1991), we considered the internal consistency of a general verdict in which the jury determined that the defendants had violated the plaintiff's constitutional rights, but nonetheless found that the defendants were entitled to qualified immunity. *Id.* at 1466. As in *Pierce,* the plaintiffs filed a post-

verdict motion for JMOL and appealed its denial, challenging the sufficiency of the evidence to support both the qualified immunity finding and the determination of liability. *Id.* at 1466, 1470. But in contrast to *Pierce,* the court held that "where inconsistent verdicts are alleged, the test is not whether there was substantial evidence for the jury's conclusion, but whether it is *possible to reconcile* the verdicts." *Id.* at 1470. Because it was possible for a jury to find qualified immunity and a violation of constitutional rights, there was no need to determine whether the facts presented supported such a verdict. *Id.* Although *Vaughan* involved an alleged inconsistency between a general verdict and a subsidiary legal conclusion on an affirmative defense, it is similar to the instant case in that it involved discrepancies between two legal conclusions, rather than the adequacy of factual findings to support a judgment.

Thus, unless the alleged inconsistency involves the sufficiency of the jury's factual findings to support the ultimate legal conclusion,[6] the defendant must raise the issue prior to submission to the jury in order to preserve any objections to sufficiency of the evidence. We see two compelling rationales for such a strict waiver rule. The opinion in *Pierce* itself explains that "[t]he rationale [for waiver] is clearly to prevent a review of the sufficiency of the evidence when the moving party has not given notice" of its objection "while there is still an opportunity for the opposing party to cure any defects in proof." 823 F.2d at 1369. Here, if the appellants believed that there was no evidence to support a split ver-

---

6. Although in a special verdict case such as *Pierce* the determination of liability is made by the trial court after reviewing the jury's factual findings, the same review of alleged inconsistencies applies to a general verdict with interrogatories where the jury itself determines liability as well as facts. *See* Fed.

R.Civ.P. 49(b) (providing that where a general verdict is unsupported by specific interrogatories the court may resubmit the issues to the jury, vacate the judgment for a new trial, or enter judgment according to the interrogatories).

dict—in other words, that if the jury found no liability for Lees, there was no evidence on which it could base a finding of liability for the corporate defendants—they should have raised their concern at the close of the evidence, such that Zhang could have, if necessary, introduced more evidence about the corporate defendants' liability. But not having raised the issue before the matter was submitted to the jury, the appellants cannot complain of a defect in proof for the resulting verdict.

The second reason for waiver is the promotion of efficiency in the trial court. If the appellants had timely made an objection to the sufficiency of the evidence to support a split verdict, and their objection had been upheld, they would have been entitled to an instruction preventing the jury from finding liability for the corporate defendants unless the jury also found liability for Lees. As it happened, however, the jury was left with instructions that did not forbid, and at least implicitly authorized, the result that it returned. We cannot sanction the time and expense of a new trial on the basis of an alleged inconsistency that, had it been raised earlier, could have been remedied by proper instructions to the jury.

This rule is consistent with the approach of our sister circuits. In *Jarvis v. Ford Motor Co.*, 283 F.3d 33 (2d Cir.), *cert. denied*, 537 U.S. 1019, 123 S.Ct. 539, 154 L.Ed.2d 427 (2002), the Second Circuit considered a similar case in which the defendant made an objection to the sufficiency of the evidence to support two different general verdicts. *Id.* at 54–56. The court applied a strict waiver rule, holding that where "any potential error related to the jury instructions and the verdict sheet," the defendants "objection needed to conform to the strictures of Fed. R.Civ.P. 51." 283 F.3d at 54. Furthermore, although the appellants rely heavily on the Tenth Circuit's opinion in *Heno v. Sprint/United Management Co.*, 208 F.3d 847 (10th Cir.2000), that case, like *Pierce*, involved the sufficiency of factual findings in a special verdict to support the ultimate determination of liability. *Id.* at 851 (noting that waiver does not apply to special verdicts). The court held that a factual finding that a corporation's agent did not discriminate precluded a legal conclusion that the corporation was liable for discrimination. *Id.* at 852. Nothing in *Heno* suggests that, when the jury returns a general verdict, an inconsistency between conclusions as to liability on different claims requires vacating the judgment.

### 2. Legal irreconcilability

The appellants' claim that the split verdict between the federal law and Washington state law discrimination claims is inconsistent fails because such inconsistencies, when permitted by jury instructions, are simply not reviewable upon appeal.[7] Unless one legal conclusion is the prerequisite for another, inconsistencies between them must stand.

Zhang argues that the appellants have waived this argument entirely because they failed to raise it at all before the district court. As discussed above, the appellants did propose jury instructions on discrimination under federal and state law,

---

7. Again, we do not mean to imply that such an inconsistency is present here. Although the appellants cite federal caselaw that suggests that the definitions of "substantial factor" and "motivating factor" under federal law are interchangeable, they cite no caselaw that indicates that the federal definition of "motivating factor" is equivalent to the Wash-

ington law definition of "substantial factor." The "substantial factor" test under Washington law was set out in *Mackay v. Acorn Custom Cabinetry*, 127 Wash.2d 302, 898 P.2d 284, 288 (1995). *Mackay* did not suggest that this test was equivalent to the test under federal law, and no subsequent Washington or Ninth Circuit decision has done so.

but these proposed instructions did not address the contention that liability for both claims was necessarily coextensive. We could, therefore, ignore this issue entirely because it was never raised below, but "we may consider an issue raised for the first time on appeal if ... the issue presented is purely one of law and the opposing party will suffer no prejudice as a result of the failure to raise the issue in the trial court." *United States v. Carlson,* 900 F.2d 1346, 1349 (9th Cir.1990). We consider the issue of the legal equivalency of two claims to be a purely legal issue, and Zhang is in the same position as he would have been had this issue been raised in a Rule 59 motion for a new trial; he is not prejudiced. We will therefore treat this claim as if it had been raised in a motion for a new trial.[8]

Nonetheless, even if the error had been raised before the district court, we could not grant a new trial on the basis of legally irreconcilable general verdicts. Rule 59 does not specify the grounds on which a motion for a new trial may be granted; instead, it allows such a motion to be granted "for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States." Fed.R.Civ.P. 59(a). We are thus bound by those grounds that have been historically recognized.

We have found no Supreme Court or Ninth Circuit cases in which an appellate court has directed the trial court to grant a new trial due to inconsistencies between general verdicts, and Ninth Circuit precedent dictates that we cannot do so. In *International Longshoremen's Union v. Hawaiian Pineapple Co.,* 226 F.2d 875 (9th Cir.1955), we explained that legally inconsistent verdicts "may nonetheless stand on appeal even though inconsistent." *Id.* at 881. In that case, the jury had returned general verdicts holding the defendant unions liable while "exonerating the individual defendants" who had acted on behalf of the unions. *Id.* While the court admitted difficulty in understanding "why the jury found [the unions] liable and did not also hold some of the leaders responsible," *id.,* it upheld that jury's right to do so. "That is the jury's prerogative." *Id.*

We are confident that this rule is historically sound and remains the majority rule. In *Jayne v. Mason & Dixon Lines,* 124 F.2d 317 (2d Cir.1941), Judge Learned Hand stated in *dicta* that it would not have been fatal to a split general verdict "if no rational reconciliation of the verdicts was possible." *Id.* at 319. More recently, in *Los Angeles v. Heller,* 475 U.S. 796, 106 S.Ct. 1571, 89 L.Ed.2d 806 (1986), Justice Stevens cited *Jayne* among the authorities supporting the proposition that "a court retains the authority, even in a civil case, to allow an apparently inconsistent verdict to stand." *Id.* at 805 n. 12 (Stevens, J., dissenting).[9] *See also Westinghouse Elec. Corp. v. Gen. Circuit Breaker & Elec. Supply Inc.,* 106 F.3d 894, 902 (9th Cir.1997) (noting without disapproval a litigant's ob-

---

**8.** We cannot treat this claim as if it had been raised earlier than the motion for a new trial stage. If it had been raised earlier, in jury instructions or in a motion for resubmission immediately after the jury had returned the verdict, the result might have been different, and thus Zhang would be prejudiced by the appellants' failure to raise the issue at these points.

**9.** This particular point of Justice Stevens's dissent was not contradicted by the majority opinion for the Court, which held that in a bifurcated trial, the jury's exoneration of a government agent in the first portion of the trial precludes a finding in the second portion of the trial that the government agency is liable. *See Heller,* 475 U.S. at 797–99, 106 S.Ct. 1571 (per curiam). The majority's holding, of course, is dictated by the basic principles of collateral estoppel.

servation that "the law forbids a judge from upsetting general verdicts merely because they are inconsistent as to different claims"); *Mosley v. Wilson*, 102 F.3d 85, 90 (3d Cir.1996) (discussing *Heller*); *Arthur Pew Constr. Co. v. Lipscomb*, 965 F.2d 1559, 1571 (11th Cir.1992) ("No authority is suggested to us that requires that general verdicts be harmonious...."); *Hines v. IBG Int'l, Inc.*, 813 F.2d 1331, 1334 (4th Cir.1987) (in a case involving "general verdicts, incapable of being nicely dissected into their constituent parts," an "apparent inconsistency is not fatal"); *Merchant v. Ruhle*, 740 F.2d 86, 91 (1st Cir.1984) (expressing, in a case involving split general verdicts on two claims, "a substantial reluctance to consider inconsistency in civil jury verdicts a basis for new trials"); *Globus v. Law Research Serv., Inc.*, 418 F.2d 1276, 1290 n. 7 (2d Cir.1969) ("[C]onsistent jury verdicts are not, in themselves, necessary attributes of a valid judgment."); *U.S. Football League v. Nat'l Football League*, 644 F.Supp. 1040, 1045–46 (S.D.N.Y.1986); *Malm v. United States Lines Co.*, 269 F.Supp. 731, 731–732 (S.D.N.Y.), *aff'd*, 378 F.2d 941 (2d Cir. 1967) (per curiam) ("Inconsistent jury verdicts upon different counts or claims are not an anomaly in the law, which at times recognizes a jury's right to an idiosyncratic position, provided the challenged verdict is based upon the evidence and the law."); Alexander M. Bickel, *Judge and Jury—Inconsistent Verdicts in the Federal Courts*, 63 Harv. L.Rev. 649, 654–55 (1950) (arguing that the rule in criminal cases that inconsistent verdicts are allowed to stand should also apply in civil cases). *But see Diamond Shamrock Corp. v. Zinke & Trumbo, Ltd.*, 791 F.2d 1416, 1425 (10th Cir.1986) (stating in *dicta* that in "cases where the several causes of action are identical and defended on the same ground, a verdict for the plaintiff on one cause of action and for the defendant on another is inconsistent"); *Will v. Compre-*

*hensive Accounting Corp.*, 776 F.2d 665, 677 (7th Cir.1985) ("As a rule civil juries must return consistent verdicts.... The civil jury has no power to dispense clemency, and verdicts in the teeth of the evidence may be set right." (citations omitted)); Shaun P. Martin, *Rationalizing the Irrational: The Treatment of Untenable Federal Civil Jury Verdicts*, 28 Creighton L.Rev. 683, 708 (1995) (opining, after noting that many federal courts accept inconsistent general verdicts, that this view "is almost certainly wrong").

Another persuasive line of cases involves discrepancies between findings of liability and damage awards, typically arising when a jury finds liability but nonetheless awards zero damages. As noted above, the damage award is not really a separate general verdict, but it is nonetheless a legal conclusion, and so these types of cases also involve purported conflicts between two legal conclusions. In *Fairmount Glass Works v. Cub Fork Coal Co.*, 287 U.S. 474, 53 S.Ct. 252, 77 L.Ed. 439 (1933), the Supreme Court refused to disturb such a verdict, even though the petitioner had urged that "the verdict should have been set aside as inconsistent on its face." *Id.* at 483, 53 S.Ct. 252. Justice Brandeis wrote that the trial court's "refusal to grant a new trial cannot be held erroneous as a matter of law. Appellate courts should be slow to impute to juries a disregard of their duties, and to trial courts a want of diligence or perspicacity in appraising the jury's conduct." *Id.* at 485, 53 S.Ct. 252. This rule retains vitality, and we have noted that "the federal rule is that failure to award damages does not by itself render a verdict invalid." *Philippine Nat'l Oil Co. v. Garrett Corp.*, 724 F.2d 803, 806 (9th Cir.1984).

The only circumstance in which we have reviewed the consistency of two legal conclusions is that presented in *Vaughan*, in

which the jury makes multiple legal conclusions relating to a single claim, one of which may be legally predicated on another. The *Vaughan* jury had returned two legal conclusions, neither of which was the ultimate verdict: It had found that the defendants were entitled to qualified immunity, and that the defendants had violated the plaintiffs' constitutional rights. *See* 950 F.2d at 1466. We did not, as noted above, examine whether these split findings could be supported by sufficient evidence, but we did conduct some review, examining whether it was *"possible to reconcile* the verdicts." *Id.* at 1470. Concluding that it was not legally impossible for a jury to make both of these conclusions, we upheld the verdict. *Id.*

In this case, there is no legal reason that the verdicts on the two discrimination claims would have had to be identical. Neither is predicated on the other, nor is exoneration from discrimination under state law an affirmative defense to discrimination under federal law. Instead, this is exactly the type of apparent inconsistency between general verdicts that has long been allowed to stand in this Circuit and others.

■ Like defects in the sufficiency of the evidence, the potential for a legally irreconcilable verdict should be addressed through jury instructions properly proposed under Rule 51. *See Jarvis,* 283 F.3d at 56 ("Objection to an inconsistency between two general verdicts that is traced to an alleged error in the jury instruction or verdict sheet is properly made under Fed.R.Civ.P. 51."); *Merchant,* 740 F.2d at 91 (noting that the defendant had agreed to instructions allowing the jury to find liability on either of two claims). Under Rule 51, instructional errors are waived if not raised in a timely fashion. "To excuse [the appellants] from the well-established rules of waiver would permit the sort of 'sandbagging' that the rules are designed to prevent, while undermining the ideal of judicial economy that the rules are meant to serve." *Jarvis,* 283 F.3d at 62. The appellants might have thought that it was advantageous *not* to propose instructions equating the claims alleging discrimination under federal and Washington law, because the jury then might have concluded that they were liable on both claims.

### C. Inconsistencies in special verdicts and interrogatories

■ Inconsistencies involving findings of fact, such as those in special verdicts and interrogatories, may arise in similar ways as inconsistencies between general verdicts. First, a jury may return answers that plainly violate its instructions. Second, under the evidence presented in the case, one or more findings of fact may be inconsistent with a determination of liability, whether that determination is made by the jury (as in a general verdict with interrogatories) or by the trial court (as in a special verdict). This sort of inconsistency was alleged in *Pierce. See* 823 F.2d at 1370. Finally, one or more findings of fact may be legally irreconcilable with each other or with a legal conclusion. Here, the appellants argue that the jury's answers on the breach of contract claim, awarding $86,000 in damages while finding $87,500 in wages willfully withheld, presents the third type of inconsistency because it is legally impossible for double damages to exceed base damages and for an employer to withhold willfully more wages than are due.

The typical case of factual findings conflicting with legal conclusions arises in the context of a special verdict or a general verdict with interrogatories. In the case of a special verdict, inconsistencies are problematic and require a new trial only if they arise between two or more factual findings; otherwise, the determination of

liability can simply be conformed to the factual findings. Similarly, in the case of a general verdict with interrogatories, the trial court has the discretion to enter judgment on the factual findings, even if they conflict with the jury's conclusion as to liability, see Fed.R.Civ.P. 49(b); only if there is a conflict within the factual findings would a new trial be required.

The alleged inconsistency here, however, arises not between two factual findings, or between a factual finding and the ultimate determination of liability, but between a factual finding and subsidiary legal conclusion within a single claim. On the issue of double damages, the trial court is required to enter judgment according to the jury's factual findings, awarding damages of $87,500; but to do so would conflict with the jury's legal conclusion as to the base damages, which it found to be $86,000. Although both damage awards are legal conclusions, this inconsistency does present a problem of legal irreconcilability because double damages are normally predicated upon, and cannot exceed, base damages. Thus if the trial court were to have followed the principle that judgment should be entered according to the jury's factual finding, it would have entered an apparently irreconcilable verdict where double damages exceeded base damages.

The district court's actual response to this dilemma was to remit the double damages award to $86,000, thus preventing any irreconcilable conflict in the final judgment. But a trial court cannot ignore the jury's factual findings in an attempt to reconcile the ultimate legal conclusions; to the contrary, legal conclusions should be conformed to the factual findings, if at all possible. We must determine whether the jury's answers were truly ir-

reconcilable, because if they were, remittitur could not save the verdict.[10]

The appellants bear a high burden to establish an irreconcilable inconsistency. The Seventh Amendment to the Constitution guarantees that "no fact tried by a jury shall be otherwise re-examined in any Court of the United States" except "according to the rules of the common law." We must accept any reasonable interpretation of the jury's actions, reconciling the jury's findings "by exegesis if necessary," *Gallick v. Baltimore & O. R.R. Co.*, 372 U.S. 108, 119, 83 S.Ct. 659, 9 L.Ed.2d 618 (1963); "a search for one possible view of the case which will make the jury's finding inconsistent results in a collision with the Seventh Amendment." *Atl. & Gulf Stevedores, Inc. v. Ellerman Lines, Ltd.*, 369 U.S. 355, 364, 82 S.Ct. 780, 7 L.Ed.2d 798 (1962). Furthermore, we review the consistency of the jury's verdict "in light of the instructions given." *Grosvenor Properties, Ltd. v. Southmark Corp.*, 896 F.2d 1149, 1151 (9th Cir.1990).

The jury was specifically instructed to award damages for breach of contract *exclusive* of damages previously awarded for discrimination:

> [I]f you find for plaintiff on his sixth claim for breach of contract, your damage award for that claim must be limited to the lost wages and benefits from the date of termination to September 29, 1999. Any damages you award for plaintiff's sixth claim should *not* include any damages you have previously awarded plaintiff on his [discrimination claims].

In other words, the jury was instructed not to double-count any lost wages that had been withheld due to discrimination

---

**10.** Because the remittitur reduced Zhang's recovery, only Zhang would have standing to challenge it on appeal. He did not do so, and we therefore have no occasion to correct the trial court's improper remittitur.

and awarded as damages on the discrimination claim. For double damages, the jury was simply asked how much in wages and benefits had been willfully withheld from Zhang prior to September 29, 1999; the jury was given no similar instruction against double-counting.

We agree with the district court's analysis that these answers can be reconciled because some of the lost wages likely were awarded as damages for the discrimination claim. If the jury had determined that at least $1500 of Zhang's wages prior to September 29, 1999, had been withheld due to discrimination and awarded that amount as part of the damages for discrimination, there would be no inconsistency. The total amount of lost wages and benefits, including those awarded as part of the discrimination award, may have been substantially greater than $86,000 or $87,500.[11]

Washington law allows for double damages for lost wages and benefits that were willfully withheld, but it does not specify that lost wages also awarded as damages for another claim, and not double-counted for the breach of contract claim, cannot form the basis for doubling. Thus, under applicable law, it was possible for the jury to award more in double damages than in damages for the breach of contract claim, because some of the damages that otherwise would have been awarded for breach of contract were already awarded for discrimination. It is a reasonable possibility that the jury was not confused and that its answers were not inconsistent. In such a case, we must honor the jury's verdict.

The trial court did not err in refusing to vacate the jury's damages awards for breach of contract. The verdict was not irreconcilable, and the deference owed to jury verdicts under the Seventh Amendment requires that any reconcilable verdict must stand.

## V. Damage awards

In addition to the discrepancy in the breach of contract damages discussed above, the appellants challenge the awards for both compensatory damages and punitive damages on Zhang's discrimination claim. We agree with the district court that both awards were justified.

### A. Supportability of the compensatory damages award

█ The jury awarded Zhang $360,000 in compensatory damages on his discrimination claim, which the appellants claim is excessive compensation for emotional distress and not supported by substantial evidence. They concede that at least $136,845 of this amount could be attributed to economic damages,[12] but maintain that the evidence is insufficient to support awarding the remaining $223,155 for emotional distress. This argument was first

---

11. Put another way, the similarity between the $87,500 double damages figure and the $86,000 damages figure may be entirely coincidental. The evidence in the record suggests that Zhang's lost wages and benefits up to September 29, 1999, could have been as much as $97,800. The jury could have, for example, determined that $11,800 of this figure was attributable to discrimination and that $87,500 of this figure was willfully withheld. It then would have included the $11,800 award in the discrimination claim, awarded the remaining $86,000 for breach of contract, and awarded an additional $87,500 in double damages for wages willfully withheld.

12. The appellants concede that Zhang demonstrated up to $222,845 in economic damages. As noted above, however, the jury was instructed not to double-count damages awarded for the § 1981 claim and breach of contract, and so the $86,000 in damages awarded for breach of contract should be deducted from this amount to determine how much of the jury's § 1981 award could be attributed to economic damages.

raised after the verdict in a motion for a new trial, and we "will not overturn a district court's denial of a motion for a new trial absent a clear abuse of discretion." *Desrosiers v. Flight Int'l of Fla., Inc.,* 156 F.3d 952, 957 (9th Cir.1998).

■ As an initial matter, we disagree with the appellants' calculation of economic damages. Although the appellants concede that the jury could have awarded Zhang back pay and front pay totaling $136,845 for the years 1999–2002, they argue that the jury could not have awarded bonuses for these years, even though Zhang's contract allowed a $25,000 annual performance bonus. We hold that the jury reasonably could have awarded bonuses for these years; the evidence in the record demonstrates that in 1998, the year before he was terminated, Zhang exceeded his performance goal and had the highest sales of any American Gem employee. The jury reasonably could have concluded that Zhang would have continued his outstanding work performance, entitling him to bonuses in each of the following four years and an additional $100,000 in economic damages. Thus the jury could have awarded up to $236,845 in economic damages, leaving only $123,155 in compensation for emotional distress.

■ Regardless of whether the figure for emotional distress damages should be $223,155 or $123,155, however, we will not disturb the award. "We may reverse a jury's finding of the amount of damages if the amount is grossly excessive or monstrous." *Lambert v. Ackerley,* 180 F.3d 997, 1011 (9th Cir.1999) (en banc), *cert. denied,* 528 U.S. 1116, 120 S.Ct. 936, 145 L.Ed.2d 814 (2000). Although the appellants argue that emotional distress damages must be supported by substantial evidence, they cite no Ninth Circuit caselaw to support this proposition, instead relying on the Fourth Circuit case *Price v. City of Charlotte,* 93 F.3d 1241, 1251 (4th Cir. 1996). The holding of *Price* that "the evidence of the emotional distress must be demonstrable, genuine, and adequately explained," *id.* at 1251, is not the law of this Circuit:

> While objective evidence requirements may exist in other circuits, such a requirement is not imposed by case law in ... the Ninth Circuit, or the Supreme Court. *See Chalmers v. City of Los Angeles,* 762 F.2d 753, 761 (9th Cir.1985) (upholding emotional damages based solely on testimony); *Johnson v. Hale,* 13 F.3d 1351, 1352 (9th Cir.1994) (noting that emotional damages may be awarded based on testimony alone or appropriate inference from circumstances); *Carey v. Piphus,* 435 U.S. 247, 264 n. 20, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978) (noting that emotional distress damages are "essentially subjective" and may be proven by reference to injured party's conduct and observations by others).

*Passantino v. Johnson & Johnson Consumer Prods., Inc.,* 212 F.3d 493, 513 (9th Cir.2000) (citation and parallel citations omitted). In *Passantino,* we upheld a $1,000,000 compensatory emotional distress damage award—in addition to $2,200,000 in economic damages—for a retaliatory discharge of an employee who complained of sex discrimination. *Id.* at 510–14.

■ Zhang's testimony alone is enough to substantiate the jury's award of emotional distress damages. Zhang testified that the job at American Gem was "my dream, working in this country," and that when he was terminated, he was "troubled," and "couldn't believe" it. He testified that when American Gem sent letters to his suppliers stating that he had been terminated, the Chinese version of the letters made it seem like "I was either criminal or something very bad." He stated that the termination "very, very

hurt my dignity and reputation," because the letters went to suppliers in Dalian, China, his hometown, and "people think there must be something wrong, because Wei is doing something wrong in the States." He testified that people from China called him, concerned about the letters, and that American Gem "ruined my future business.... Because doing business in China, your reputation and your credibility is the key." Despite the fact that his testimony was hampered by language and translation problems, the jury obviously could have gleaned that he was greatly hurt and humiliated by his termination and the manner in which it was carried out. Under *Passantino*, this testimony is more than sufficient to support a substantial compensatory damage award for emotional distress. The award of compensatory damages was not "grossly excessive or monstrous." *Lambert*, 180 F.3d at 1011. The district court committed no error, let alone a clear abuse of discretion, in denying the motion for a new trial on this basis.

### B. Supportability of the punitive damages award

The jury awarded Zhang $2,600,000 in punitive damages on his discrimination claim against the corporate defendants, which the appellants argue is not supported by substantial evidence. The appellants first raised this objection in their post-trial motions for a new trial and for JMOL, arguing that punitive damages should not be available at all. Zhang counters that this objection has been waived.

■ Ordinarily, this Court can strike down a jury award of punitive damages if the evidentiary prerequisites to such an award are not supported by substantial evidence. *Lambert*, 180 F.3d at 1012. In a federal employment discrimination suit such as this one, punitive damages are available against an employer who " 'discriminate[s] in the face of a perceived risk that its actions will violate federal law.' ... [A]lthough egregious conduct could be evidence of intent to break the law, such conduct [is] not required to establish punitive damages liability. Thus, in general, intentional discrimination is enough to establish punitive damages liability." *Passantino*, 212 F.3d at 515 (quoting *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 536, 119 S.Ct. 2118, 144 L.Ed.2d 494 (1999)) (first alteration in original). Review of the sufficiency of the evidence to support punitive damages would thus be nearly identical to substantial evidence review for liability for discrimination.

■ Just as our review of the evidence supporting the corporate defendants' liability for discrimination is foreclosed by waiver, however, our review of the evidence supporting the availability of punitive damages is limited because the appellants did not raise the issue until after trial. As noted above, in general, a challenge to the sufficiency of the evidence must be made in a Rule 50(a) motion for JMOL at the close of the evidence in order to be renewed in a Rule 50(b) motion for JMOL after trial. Fed.R.Civ.P. 50(b); *Janes*, 279 F.3d at 887. In *Kelly v. City of Oakland*, 198 F.3d 779 (9th Cir.1999), we held that this rule governs review of the evidence supporting punitive damages, concluding that where the defendant did not object to the jury instructions on punitive damages, and did not challenge the sufficiency of the evidence to support punitive damages in his Rule 50(a) motion, he could not raise the issue in a Rule 50(b) motion. *Id.* at 786. The same situation is presented here; the record does not reflect that the corporate defendants objected to instructions allowing the jury to award punitive damages, nor that they made any objection to the sufficiency of the evidence for a

punitive damages award at the close of the evidence.

As in their challenge to the sufficiency of the evidence underlying the liability finding, however, the appellants argue that the waiver rules are different where the issue of evidentiary sufficiency is raised only by the alleged inconsistency in the jury's verdict. According to this argument, although the evidence at trial might have been sufficient to support a punitive damages award, it could not support such an award in the absence of a finding of liability against Lees.

We will apply the same rules to review of the punitive damages award as we did to the liability finding. If the appellants believed that there was insufficient evidence to support punitive damages unless the jury found that Lees was liable for discrimination, they should have pointed this out prior to submission of the case to the jury, thereby giving Zhang the opportunity to correct any defects in proof. The appellants could have requested a jury instruction that would have allowed the jury to find punitive damages only if they found Lees liable for discrimination. Having failed to do so, they cannot now challenge the sufficiency of the evidence supporting the damage award.[13]

### C. Constitutionality of the punitive damages award

Even though the jury's decision to award punitive damages was supported by substantial evidence, we must also determine whether the amount of the award is unconstitutionally excessive. In recent years, the Supreme Court has recognized a due process right to be free from excessive punitive damages. The appellants argue that the $2,600,000 award here was excessive and should be reduced to some unspecified amount. Even though the appellants only raised this issue in post-trial motions, the Supreme Court has ruled that the appellate courts should review the district court's denial of remittitur of the award de novo. *Cooper Indus., Inc. v. Leatherman Tool Group, Inc.*, 532 U.S. 424, 431, 121 S.Ct. 1678, 149 L.Ed.2d 674 (2001).

In *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996), the Supreme Court first announced "[t]hree guideposts" for assessing the constitutionality of punitive damage awards: "the degree of reprehensibility of the[defendant's conduct]; the disparity between the harm or potential harm suffered by [the plaintiff] and his punitive damages award; and the difference between this remedy and the civil penalties authorized or imposed in comparable cases." *Id.* at 574–75, 116 S.Ct. 1589. *BMW* was the first time the Court had ever struck down a punitive damages award as unconstitutionally excessive; the Court reaffirmed *BMW* in questioning the size of a punitive damages award in *Cooper Industries*, 532 U.S. at 440–43, 121 S.Ct. 1678, and recently followed *BMW* in striking down another punitive damages award in *State Farm Mutual Insurance Co. v. Campbell*, — U.S. —, ———–——, 123 S.Ct. 1513, 1521–26, 155 L.Ed.2d 585 (2003). In addition to these Supreme Court precedents, our analysis herein is guided by our decision in *Swinton v. Potomac Corp.*, 270 F.3d 794 (9th Cir.2001), *cert. denied*, 535 U.S. 1018, 122 S.Ct. 1609,

---

**13.** The appellants' contention that this issue arose only due to the alleged inconsistency in the verdict, which could not have been foreseen, is somewhat disingenuous. In their motion for JMOL after the verdict was returned, in which they first raised their argument regarding punitive damages, the argument was styled "The Court should not have instructed the Jury on Punitive Damages." Clearly, the appellants recognized that this was an instructional issue and could have been raised at an earlier point.

152 L.Ed.2d 623 (2002), in which we applied the *BMW* guideposts to a § 1981 discrimination case. *Id.* at 817–20, 116 S.Ct. 1589.

### 1. *Reprehensibility*

██ "Perhaps the most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." *BMW*, 517 U.S. at 575, 116 S.Ct. 1589. The appellants rest their constitutional challenge entirely on the reprehensibility guidepost, relying on the *BMW* Court's statement, made even before analyzing the other two factors, "that BMW's conduct was not sufficiently reprehensible to warrant imposition of a $2 million exemplary damages award." 517 U.S. at 580, 116 S.Ct. 1589.

The gulf between the reprehensibility of the corporate defendants' actions here and the conduct at issue in *BMW, Cooper Industries,* and *State Farm,* however, is substantial. In *BMW,* the defendant automaker had fraudulently failed to disclose its practice of selling cars as new after repairing minor predelivery damage. 517 U.S. at 563–64, 116 S.Ct. 1589. In *Cooper Industries,* the defendant had been found liable for falsely advertising another competitor's product as its own. 532 U.S. at 427–29, 121 S.Ct. 1678. In *State Farm,* the defendant insurance company had implemented a fraudulent policy of limiting costs by refusing to settle insurance claims and then capping claims payments after losing at trial. —— U.S. at ——–——, 123 S.Ct. at 1517–19. Although the plaintiffs in *State Farm* did allege emotional distress, *id.* at 1518, the reprehensibility of the fraudulent business practices at issue in these Supreme Court cases is different

in kind from the reprehensibility of intentional discrimination on the basis of race or ethnicity.

Although *BMW* held that "purely economic" harms are less likely to warrant substantial punitive damages awards, 517 U.S. at 576, 116 S.Ct. 1589, intentional discrimination is a different kind of harm, a serious affront to personal liberty. *See Romano v. U–Haul Int'l, Inc.,* 233 F.3d 655, 673 (1st Cir.2000), *cert. denied,* 534 U.S. 815, 122 S.Ct. 41, 151 L.Ed.2d 14 (2001) (finding that a plaintiff's termination on the basis of her sex was "more reprehensible than would appear in a case involving economic harms only"). There can be no question of the importance of our society's interest in combating discrimination; this nation fought the bloodiest war in its history in part to advance the goal of racial equality, adding several amendments to the Constitution to cement the battlefield victory. *See* U.S. Const. amends. XIII, XIV, XV. Freedom from discrimination on the basis of race or ethnicity is a fundamental human right recognized in international instruments to which the United States is a party, *see, e.g.,* International Convention on the Elimination of All Forms of Racial Discrimination, *adopted by the U.N. General Assembly* Dec. 21, 1965, 660 U.N.T.S. 195 (*entered into force for the United States* Nov. 20, 1994), and the intentional deprivation of that freedom is highly reprehensible conduct.[14]

Racial discrimination often results in large punitive damage awards. *See Swinton,* 270 F.3d at 817–18 (finding that an employer's failure to address a pattern of racial slurs and harassment was sufficiently reprehensible to support a $1 million punitive damage award); *Pavon v. Swift*

---

**14.** Indeed, the appellants' argument seems to depend on the position that the corporate defendants did not in fact discriminate against Zhang. As noted above, however, we are bound by the jury's finding that the corporate defendants did discriminate on the basis of race or ethnicity.

*Transp. Co.*, 192 F.3d 902, 909 (9th Cir. 1999) (finding that an employer's toleration of racial slurs and termination of an employee who complained of them was sufficiently reprehensible to justify a $300,000 punitive damage award); *Hampton v. Dillard Dep't Stores, Inc.*, 247 F.3d 1091, 1116 (10th Cir.2001), *cert. denied*, 534 U.S. 1131, 122 S.Ct. 1071, 151 L.Ed.2d 973 (2002) (finding that where two African American women had been suspected of shoplifting and briefly detained on the basis of their race, the store's conduct was sufficiently reprehensible to support the award of $1.1 million in punitive damages). We have no trouble concluding that the corporate defendants' discrimination against Zhang was sufficiently reprehensible to justify a substantial punitive damages award.

### 2. Ratio of punitive to compensatory damages

■ "The second and perhaps most commonly cited indicium of an unreasonable or excessive punitive damages award is its ratio to the actual harm inflicted on the plaintiff." *BMW*, 517 U.S. at 580, 116 S.Ct. 1589. This guidepost is generally analyzed by comparing punitive and compensatory damages. *Id.* at 581, 116 S.Ct. 1589.

"In most cases, the ratio will be within a constitutionally acceptable range, and remittitur will not be justified on this basis." *Id.* at 573, 116 S.Ct. 1589. The Court has refused to give a precise mathematical guideline for the "constitutionally acceptable range," but the two cases in which the Court struck down punitive damages awards both involved rather large ratios of punitive to compensatory damages: in *BMW*, the ratio was a "breathtaking 500 to 1," *id.;* in *State Farm*, the ratio was 145 to one, —— U.S. at ——, 123 S.Ct. at 1524. Likewise, in *Cooper Industries*, where the Court questioned the size of the award but declined to rule on its constitutionality, the

ratio was ninety to one. 532 U.S. at 429, 121 S.Ct. 1678.

Despite its refusal to establish a firm numerical limit to the ratio, the *BMW* Court noted that precedent "suggested that the relevant ratio was not more than 10 to 1," 517 U.S. at 559, 116 S.Ct. 1589. In *State Farm*, the Court "decline[d] again to impose a brightline ratio which a punitive damage award cannot exceed," —— U.S. at ——, 123 S.Ct. at 1524, but offered similar guidance on the general limits to an acceptable ratio: "[I]n practice, few awards exceeding a single-digit ratio … will satisfy due process." *Id.* "Single-digit multipliers are more likely to comport with due process" than the extreme ratios found in *BMW* or *State Farm. Id.*

In this case, the ratio of the $2.6 million punitive damage award to the $360,000 compensatory damage award is slightly more than seven to one. This is of course a single-digit ratio, far below the ratios at issue in *BMW, Cooper Industries*, and *State Farm*. We are aware of no Supreme Court or Ninth Circuit case disapproving of a single-digit ratio between punitive and compensatory damages, and we decline to extend the law in this case. The ratio here is not constitutionally excessive.

### 3. Civil or criminal penalties

■ "Comparing the punitive damages award and the civil or criminal penalties that could be imposed for comparable misconduct provides a third indicium of excessiveness." *BMW*, 517 U.S. at 583, 116 S.Ct. 1589. In both *BMW* and *State Farm*, the Court concluded that the maximum fine that could be imposed for the conduct at issue was $10,000. 517 U.S. at 584, 116 S.Ct. 1589,. The Court found that the $2 million award in *BMW* was "substantially greater than the statutory fines available," 517 U.S. at 584, 116 S.Ct. 1589, and that the civil fine in *State Farm* was

"dwarfed by the $145 million punitive damages award," —— U.S. at ——, 123 S.Ct. at 1526.

As we held in *Swinton*, however, "[t]here are no 'civil penalties' for the type of conduct for which [the appellants were] held liable in this case." 270 F.3d at 820. In assessing the punitive damage award at issue in *Swinton*, we noted that Congress had imposed a $300,000 punitive damage cap for violations of Title VII, reasoning that this damage cap represented a legislative judgment similar to the imposition of a civil fine. *Id.* at 820.

The discrepancy between the $10,000 fines and multimillion dollar awards at issue in *BMW* and *State Farm* is far greater than that between the $300,000 Title VII cap and the $2,600,000 award at issue here. In addition, as we underscored in *Swinton*, "Congress has not seen fit to impose any recovery caps in cases under § 1981 ...," although it has ample opportunity to do so." *Id.* And, as we noted in *Swinton*, that one *BMW* guidepost may indicate that a particular award raises *BMW*-type concerns does not prove that award to be constitutionally excessive. Thus, as we did in *Swinton*, *see id.*, we hold that, on balance, the punitive damages award here did not violate due process. The conduct of the corporate defendants was highly reprehensible, and the punitive award exceeded the compensatory award only by a single-digit multiplier. Thus, although the punitive damages cap established for an analogous statute, Title VII, is substantially lower than the award here, the discrepancy is not nearly so great as in *BMW* or *State Farm*. Accordingly, we will not dis-

turb the jury's award of punitive damages.[15]

### CONCLUSION

For the foregoing reasons, the judgment of the district court is AFFIRMED in all respects.

AFFIRMED.

---

15. The appellants also argued that the punitive damages award demonstrated such passion and prejudice that not only must the award be reduced, but the liability determination must be vacated as well. In light of our conclusion that reduction of the award is not justified, and the fact that the appellants have cited no caselaw suggesting that passion and prejudice may be inferred from a large damages award alone, we decline to address this argument.