FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| VINCENT KEITH BELL, | No.22-16580 |
| *Plaintiff-Appellee*, | D.C. No. 3:18-cv-01245-SI |
| v. | |
| WILLIAMS, #6040; CITY AND COUNTY OF SAN FRANCISCO, | OPINION |
| *Defendants-Appellants*, | |
| and | |
| FISHER, #1152; LEUNG, #2019; ANTHONY BRYANT; JOHNSON BUI; ROBERT DALY; KRISTIAN DEJESUS; DENNIS WALSH; ROBERT YEUNG, | |
| *Defendants*. | |

| | |
|---|---|
| VINCENT KEITH BELL, | No.22-16787 |
| *Plaintiff-Appellee*, | D.C. No. 3:18-cv-01245-SI |
| v. | |

YVETTE WILLIAMS, Sgt. #6040;
CITY AND COUNTY OF SAN
FRANCISCO,

*Defendants-Appellants*,

 and

FISHER, #1152; LEUNG, #2019;
ANTHONY BRYANT; JOHNSON
BUI; ROBERT DALY; KRISTIAN
DEJESUS; DENNIS WALSH;
ROBERT YEUNG,

*Defendants*.

Appeals from the United States District Court
for the Northern District of California
Susan Illston, District Judge, Presiding

Argued and Submitted February 12, 2024
San Francisco, California

Filed July 18, 2024

Before:  Carlos T. Bea, David F. Hamilton,[*] and Morgan
Christen, Circuit Judges.

Opinion by Judge David F. Hamilton

---

[*] The Honorable David F. Hamilton, United States Circuit Judge for the
Seventh Circuit Court of Appeals, sitting by designation.

# SUMMARY[**]

## Civil Rights/Pretrial Detainees

The panel affirmed in part, reversed in part, and vacated in part the district court's judgment and damages award for Vincent Bell following a jury trial in Bell's action alleging that deputies used excessive force against him during a cell extraction and transfer while he was a pretrial detainee in the San Francisco Jail, in violation of the Fourteenth Amendment, the Americans with Disabilities Act (ADA), and the Rehabilitation Act.

Bell alleged that Sergeant Yvette Williams did not provide Bell, whose right leg is amputated above the knee, a wheelchair or other mobility device during the procedure to accommodate Bell's disability. Instead, she required Bell to hop on his one leg until it gave out. She then stood by as deputies picked up Bell and carried him by his arms and leg the rest of the way.

The panel held that substantial evidence supported the jury's verdict on the merits of Bell's Fourteenth Amendment excessive force claim against Williams and his ADA and Rehabilitation Act claims against the City and County of San Francisco. Even assuming that Bell's initial resistance to moving cells created a disturbance warranting the use of force, evidence supported Bell's argument that he had resigned himself to moving cells and demonstrated complete compliance by the time Sergeant Williams began the cell extraction. Williams' decision to commence the cell

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

extraction without using a wheelchair or other assistive device resulted in Bell being carried by his arms and leg, a use of force that the jury could find unreasonable, especially given the alternatives contemplated by the jail's policies. The jury could also find that reasonable accommodations existed to assist Bell in transiting between the two cells, even in light of the jail's legitimate security interests, and the district court did not err in its jury instructions on Bell's ADA and Rehabilitation Act claims.

The panel reversed the district court's decision as to Bell's *Monell* theory of liability for the constitutional violation because Bell did not present substantial evidence at trial showing that the City's training was the product of deliberate indifference to a known risk.

The panel also vacated the jury's compensatory damages award and remanded for a remittitur or a new trial. Although the panel gave substantial deference to the jury and to the district court's firsthand assessment of Bell's injuries, the panel concluded, as a matter of law, that Bell did not present evidence about his two-minute experience resulting in relatively minor injuries that could support the award of more than half a million dollars in compensatory damages.

**COUNSEL**

Andrew C. Kim (argued), Kim Law Office, Belmont, California; EmilyRose Johns (argued) and Dan Siegel, Siegel Yee Brunner & Mehta, Oakland, California; for Plaintiff-Appellee.

Edmund T. Wang (argued) and Renee E. Rosenblit, Deputy City Attorneys; Meredith B. Osborn, Chief Trial Deputy;

David Chiu, City Attorney; San Francisco City Attorney's Office, San Francisco, California, for Defendants-Appellants.

---

## OPINION

HAMILTON, Circuit Judge:

This appeal presents issues concerning treatment of jail detainees with disabilities. Plaintiff Vincent Bell was a pretrial detainee in the San Francisco Jail. Defendant Sergeant Yvette Williams decided to extract Bell forcibly from his normal cell to place him in a safety cell. Williams did not provide Bell—whose right leg is amputated above the knee—a wheelchair or other mobility device during the procedure to accommodate Bell's disability. Instead, she required Bell to hop on his one leg until it gave out. She then stood by as deputies picked up Bell and carried him by his arms and leg the rest of the way. Bell sued Williams, the City and County of San Francisco (the City), and other defendants not at issue in this appeal. He alleged that the defendants violated the Fourteenth Amendment, the Americans with Disabilities Act (ADA), and the Rehabilitation Act. The case went to trial.

The jury found that Sergeant Williams caused the use of excessive force against Bell during the cell extraction in violation of the Fourteenth Amendment and denied Bell reasonable accommodations in violation of the ADA and Rehabilitation Act. The jury also found that the City inadequately trained its jail officers on how to perform cell extractions on detainees with disabilities, thereby holding the City liable for Williams' constitutional violation. The

jury awarded Bell $504,000 in compensatory damages, but only against the City. The district court denied the defendants' post-trial motion for judgment as a matter of law or a new trial. Defendants have appealed.

We affirm in part and reverse in part. Substantial evidence supported Bell's Fourteenth Amendment excessive force claim and his ADA and Rehabilitation Act claims. The district court also did not err in its jury instructions. However, we reverse the district court's decision as to Bell's *Monell* theory of liability for the constitutional violation because Bell did not present substantial evidence at trial showing that the City's training was the product of deliberate indifference to a known risk. We also vacate the jury's compensatory damages award and remand for a remittitur or a new trial. We give substantial deference to the jury and to the district court's firsthand assessment of Bell's injuries. Despite that deference, however, we conclude as a matter of law that Bell did not present evidence about this two-minute experience resulting in relatively minor injuries that could support more than half a million dollars in compensatory damages. We remand to the district court for Bell to choose between a new trial on damages or remittitur in an amount to be set by the district court consistent with this opinion.

## I.  *Factual Background*

Because this appeal concerns the defendants' motion for judgment as a matter of law or alternatively a new trial, we present the facts in the light most favorable to Bell as the non-moving party. *Harper v. City of Los Angeles*, 533 F.3d 1010, 1021 (9th Cir. 2008).

Bell used a wheelchair and a prosthetic leg to move around the San Francisco County Jail because his right leg is amputated above the knee. Medical staff at the jail issued

both devices to Bell and instructed him not to hop around on his one leg. Though Bell could stand on his left leg while holding onto something, he generally relied on these devices for mobility while incarcerated.

This appeal concerns an incident that occurred on January 18, 2018, which was set in motion by events from four days earlier. According to Bell, on January 14, he asked Deputy Andy Leung for a shaving razor. Leung allegedly responded by asking to see Bell's penis. Bell told Leung he was going to file a grievance reporting sexual harassment.

Later that same day, Bell sat in his cell watching the final moments of the NFC divisional playoff game between the Minnesota Vikings and the New Orleans Saints. The Vikings trailed the Saints by one point. Sixty-one yards away from the end zone, the Vikings lined up for their final snap from scrimmage. Vikings wide receiver Stefon Diggs made a leaping catch and ran into the end zone in a play that has come to be known as the "Minneapolis Miracle." Bell and other detainees in the San Francisco Jail cheered wildly. Leung told Bell to quiet down. Bell responded by telling Leung to "Shut the f*** up."

Leung issued Bell a Request for Discipline for this incident. Bell claims that Leung singled him out in retaliation for threatening to file a grievance about the alleged sexual harassment. Sergeant Yvette Williams reviewed the Request for Discipline against Bell and sustained it. She determined that Bell had committed three disciplinary violations: direct order, gestures/language, and general order. Williams enhanced Bell's punishment for showing disrespect toward jail staff on prior occasions. Ultimately, she ordered Bell to be placed in restricted

housing for ten days, prohibited him from having visitors for ten days, and took away his commissary access for ten days.

On January 18, Williams began the process of moving Bell to restricted housing. At the time, Bell resided in Isolation Cell #3, a single-occupancy administrative segregation cell. Williams planned to move Bell to Isolation Cell #2. Bell objected. He was already in administrative segregation, and he saw no difference between the two cells besides the fact that the television in Isolation Cell #2 was not working.

Williams instructed a jail deputy to give Bell two large plastic bags to pack up his things. Bell yelled that he was not going to move and allegedly placed his mattress against his cell door to prevent anyone from entering his cell. He also wrapped a large plastic bag over himself to defend against pepper spray. Williams decided that a Special Operations Response Team would be needed to extract Bell from his cell and place him in a safety cell. Williams made her decision to order a cell extraction at 9:10 AM. She began to prepare for the extraction: she checked with her captain, assembled deputies and gear, and organized a team outside of Bell's pod.

Though Bell contests some of these facts, he admits that he did not comply initially with Williams' order to switch cells. Bell contends, however, that he agreed to move if he could first speak with a supervisor. Williams testified at trial that she was not aware of Bell's change of heart. From her perspective, when she was preparing to perform the cell extraction, Bell still posed a danger to others by angrily refusing to switch cells.

At 9:56 AM, Williams began the cell extraction. The following facts are taken from a video documenting the

extraction.  Williams and about nine other deputies lined up outside Bell's pod.  They were equipped with face shields, chest plates, and limb coverings, and they were armed with tasers and a plastic shield.

The deputies opened the door to Bell's pod and entered one by one, rushing toward Bell's cell.  The video shows that by the time they reached his cell, Bell was sitting calmly in his wheelchair.  Bell was not wearing a plastic bag over his head, and there was no indication that his mattress was barricading his cell door.  His belongings were assembled on top of his bed as if he were ready to move cells.

As soon as he saw the deputies enter his cell, Bell put his hands above his head.  Sergeant Williams ordered Bell to "get on the ground."  Bell immediately complied.  Sergeant Williams then yelled, as deputies began handcuffing Bell's wrists, "do not resist."  Bell calmly responded, "I am not resisting," and indeed, the video does not show any resistance on Bell's part.

The deputies handcuffed Bell's hands behind his back and helped him stand up on his one leg.  He was shoeless. Sergeant Williams then instructed Bell to hop on his bare left foot to a safety cell, a distance of about 64 feet.  Bell tried to comply.  A deputy stood on either side of him as he hopped, holding him up by his arms.  About two-thirds of the way there, Bell fell to the ground.  He said that his leg was tired. Sergeant Williams instructed Bell to stand up.  Bell repeated that his leg was tired and he remained on the ground. Sergeant Williams then told the deputies to "assist him to his foot."  The deputies reached down, picked up Bell by his two arms and one leg, and carried him the rest of the way.  Bell's arms were handcuffed behind his back, so carrying him that way put significant pressure on his shoulders.  Bell testified

that he heard his shoulder pop in the process. Once in the safety cell, the deputies removed all of Bell's clothing and left him naked in the cell. Bell did not resist the officers stripping his clothes.

After the cell extraction, Bell did not receive any medical treatment. A nurse briefly evaluated Bell by looking through the cell door's tray slot. She noted only that Bell exhibited "no obvious trauma or injury to the area he pointed [as] having pain." She reported that Bell had "no redness" and "no discoloration" and "seemed able to move limbs and arm without difficulty." The nurse's evaluation went no further than observing Bell through the tray slot. She did not administer any treatment, and there is no evidence that she conducted a hands-on assessment.

## II. *Procedural History*

Bell sued Sergeant Williams, the deputies involved in the cell extraction, the Chief Deputy, and the City and County of San Francisco. He alleged that the defendants' actions in conducting the cell extraction and placing him in the safety cell violated the Fourteenth Amendment's prohibitions against excessive force and punitive conditions of confinement for pretrial detainees, and violated the ADA and Rehabilitation Act by failing to provide a reasonable accommodation of his disability in the cell extraction and transfer. He also alleged that the defendants violated the ADA and Rehabilitation Act by failing to provide him a portable toilet. Finally, Bell alleged that Sergeant Williams and two deputies retaliated against him for filing a grievance in violation of the First Amendment. Bell sought compensatory and punitive damages, as well as declaratory and injunctive relief.

Both sides moved for summary judgment. The court denied Bell's motion and granted the defendants' motion in part. It held that the individual deputies had qualified immunity on Bell's excessive force claim because "a reasonable officer would not have understood" that carrying out a cell extraction under Sergeant Williams' direction would have violated clearly established law. But to determine whether Sergeant Williams herself was entitled to qualified immunity, the district court concluded, factual disputes needed to be resolved at trial. The court identified lingering factual disputes around whether Bell told Williams he would comply, whether Bell was a danger to others, and whether Bell could have been transported in a wheelchair.

The district court granted summary judgment to all the individual defendants except Sergeant Williams on Bell's First and Fourteenth Amendment claims. The district court also granted summary judgment to the City on two of Bell's *Monell* theories of liability—one alleging the City had an unlawful pattern and practice of using safety cells for disciplinary and retaliatory purposes, and the other alleging that either Williams or the Chief Deputy had final policymaking authority over the cell extraction policy. The district court denied summary judgment on Bell's third theory of *Monell* liability, holding that material factual disputes remained as to whether the City failed to train its employees adequately on cell extraction procedures and safety cell usage for detainees with disabilities. The court denied summary judgment on all of Bell's other claims, including his ADA and Rehabilitation Act claims. Before trial, the district court concluded that Bell failed to administratively exhaust his ADA and Rehabilitation Act claims related to the lack of an accessible toilet in the safety cell. At trial, however, the district court allowed Bell to

testify about the lack of an accessible toilet in his safety cell "insofar as that is relevant to his [due process] claim that his placement in the safety cell was punitive."

The remaining claims against Sergeant Williams and the City were tried before a jury in March 2022. The jury's verdict was mixed, setting up several issues for appeal. The jury found in Bell's favor on his excessive force claim against Williams but concluded that Bell did not prove that Williams caused him physical or emotional harm. The jury further found in Bell's favor on his remaining *Monell* claim against the City for failure to train its deputized staff on the proper use of cell extractions and safety cells and on his ADA and Rehabilitation Act claims against the City. But the jury found in favor of the defendants on Bell's Due Process and First Amendment claims. The jury concluded that the City's misconduct had caused Bell physical and emotional harm and awarded him $504,000 in compensatory damages. The jury did not award punitive damages.

The district court affirmatively enjoined the City to modify its policies on safety cell placements and cell extractions. The court also ordered the City to require staff to consider reasonable accommodations when transporting a detainee with known mobility issues.

After trial, defendants moved for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(b) or, in the alternative, a partial new trial pursuant to Rule 59. The court denied the motion, and Williams and the City have appealed.

III. *Standards of Review*

We review de novo a denial of a Rule 50(b) renewed motion for judgment as a matter of law. *Harper*, 533 F.3d

at 1021.  We do not reweigh the evidence or substitute our preferred result.  We must uphold the jury's verdict if it is "supported by substantial evidence, which is evidence adequate to support the jury's conclusion, even if it is also possible to draw a contrary conclusion." *Id.* (quoting *Pavao v. Pagay*, 307 F.3d 915, 918 (9th Cir. 2002)).  Additionally, we "must view all evidence in the light most favorable to the nonmoving party, draw all reasonable inferences in the favor of the non-mover, and disregard all evidence favorable to the moving party that the jury is not required to believe." *Id.* Grant of a renewed motion for judgment as a matter of law is proper only if the evidence permits just one reasonable conclusion that is contrary to the jury's verdict. *Id.*

We review for an abuse of discretion a district court's denial of a motion for a new trial.  *Kode v. Carlson*, 596 F.3d 608, 611 (9th Cir. 2010).  A new trial should be granted "only if the jury's verdict was against the clear weight of the evidence." *Union Oil Co. of California v. Terrible Herbst, Inc.*, 331 F.3d 735, 742 (9th Cir. 2003).

IV. *Analysis*

The City argues that the district court erred in denying its post-trial motions.  It challenges the merits of Bell's claims, the jury instructions given at trial, and the amount of the damages award.  We address each argument in turn.

A. *Excessive Force Claim*

Bell asserted that Williams directed the use of excessive force against him by ordering the Special Operations Response Team to extract him forcibly from his cell without the assistance of a wheelchair or other mobility device, resulting in the deputies carrying him by his limbs and

causing him physical and emotional injuries.  The jury found in Bell's favor as to Williams' liability.

On appeal, Williams and the City argue that Bell failed to prove his excessive force claim on the merits.  Williams also argues that, even if Bell succeeded on the merits, she is entitled to qualified immunity because it was not clearly established that she was required to provide Bell accommodations during the cell transportation process. Finally, the City argues that it cannot be held liable for this excessive force claim under a *Monell* theory of liability because Bell did not introduce substantial evidence showing that the City's training was inadequate.

We conclude that Bell presented enough evidence at trial to uphold the jury's verdict on the merits of his excessive force claim against Williams.  Because the jury did not impose any damages against Williams, we find no reason to reach her qualified immunity defense.  That defense would protect her only from individual liability, which the jury did not impose.  However, the jury did award $504,000 in compensatory damages against the City.  We must therefore decide whether the City can be held liable for Williams' actions directing the use of excessive force against Bell.  We conclude that Bell did not present substantial evidence to support his failure-to-train theory of *Monell* liability.

## 1.  *Merits of the Excessive Force Claim*

To succeed on an excessive force claim, a pretrial detainee like Bell must show that "the force purposely or knowingly used against him was objectively unreasonable." *Kingsley v. Hendrickson*, 576 U.S. 389, 396–97 (2015). Courts review these claims "from the perspective of a reasonable officer on the scene," and take into account the

particular facts and circumstances of each case. *Id.* at 397. Courts consider factors including

> the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting.

*Id.* Judged against this test, substantial evidence in the record allowed the jury to find that Williams directed the use of excessive force against Bell.

### a. *Security Threat at Issue*

One relevant consideration in determining the security threat that Bell posed at the time of his cell extraction was his history of dangerous behavior. Bell had a mixed record on that front. Williams provided evidence that Bell had previously gotten into fights with other detainees, and in 2017 he had hidden a jail-made shank in his wheelchair. Bell testified that he had never physically attacked a deputy while incarcerated, and Williams did not contradict this assertion. For purposes of this case, we assume that Bell has previously exhibited threatening behavior by, among other things, hiding dangerous weapons in his wheelchair because this fact is uncontested.

The security threat posed by Bell's history was diminished, however, by his admittedly late compliance at the time of his cell extraction. Video evidence shows Bell sitting calmly in his wheelchair, raising his hands when the

deputies entered his cell, and immediately complying with all orders to the best of his ability. Even Williams conceded that Bell demonstrated compliance during the cell extraction itself.

Generally, a detainee's in-the-moment compliance carries more weight when assessing his security threat than his prior non-compliant behavior. Imagine that Bell had complied with Williams' instruction to move cells at the start of their interaction. He would have had the same history of dangerous behavior, but Williams would not have ordered a cell extraction. The security threat that Bell posed was thus heightened primarily by his recent hostility rather than his more remote history. When his aggressiveness ceased, so too did the greater portion of the threat he presented. That's not to say that his initial resistance to moving cells should be ignored entirely—his hostility made him a greater security risk than if he had not resisted at all. But the prospective use of force is concerned with the risk of imminent threat, so the threat assessment is weighted more toward immediate events. *See Hyde v. City of Willcox*, 23 F.4th 863, 870 (9th Cir. 2022) ("The most important factor [in the *Kingsley* analysis] is whether the suspect posed an *immediate* threat." (emphasis added)); *Jacobs v. Cumberland County.*, 8 F.4th 187, 195 (3d Cir. 2021) (jail officers did not face a security threat despite the plaintiff-detainee having been fighting another detainee only fifteen minutes prior); *Edrei v. Maguire*, 892 F.3d 525, 537 (2d Cir. 2018) (considering "imminent" threats in determining the security threat posed).

### b. *Whether Bell was Actively Resisting*

As noted, Bell was not actively resisting at the time of his cell extraction. However much Bell may have resisted

Williams' commands earlier in the day, the video evidence confirms Bell's compliance at the time of the cell extraction.

###### c. *The Threat Reasonably Perceived by Officers*

This factor overlaps with the first two. The security threat posed by Bell, and whether he was actively resisting at the time of the cell extraction, determine the threat level that an officer would reasonably perceive.

As noted, Bell's history caused Williams to perceive him as posing a significant security threat when he resisted moving cells. But once Bell stopped resisting, a reasonable officer would understand that he posed a lesser security threat. He still presented *some* threat. After all, Bell had demonstrated that he could hide a shank in his wheelchair, and he had belligerently refused to move cells earlier that same morning. But Bell's compliance at the time of his cell extraction reduced that apparent threat. Whatever threat Bell posed was reduced even further when he was handcuffed and agreed to move cells.

###### d. *Efforts to Temper the Force Used*

The deputies attempted to temper the force they used in extracting Bell from his cell. As the video shows, the deputies assisted Bell on either side of him for the first two-thirds of his transfer down the hall.

After Bell fell, however, the deputies picked him up by his handcuffed arms and leg. Carrying a detainee against his will is a greater degree of force than supporting him while he moves on his own, especially when it involves pulling a detainee's shoulders into a painful position. The deputies could have paused for a moment and let Bell catch his breath or used a wheelchair for the remainder of the distance, but Sergeant Williams insisted they continue without pause.

Despite the deputies' attempts to temper their force, the force used was still greater than would have been necessary if the deputies had used a wheelchair or other mobility device, either from the beginning or after Bell fell.

### e.  *The Extent of Bell's Injuries*

The excessive force inquiry is like a balancing scale—if a jail official uses greater amounts of force, she must justify it with a more robust reason.  The extent of a detainee's injuries fits into this equation indirectly.  A detainee's injuries may indicate, albeit imperfectly, the amount of force that was used to cause them.  *Patel v. Lanier County.*, 969 F.3d 1173, 1184 (11th Cir. 2020).  By serving as a proxy for the force used, the extent of a detainee's injuries estimates the justification needed on the other side of the scale.

Bell testified that, when he was hopping, he experienced pain in his hips, knee, ankle, and back that rated 9.5 on a 10-point scale.  He also testified that he heard his shoulder pop when the deputies lifted him by his handcuffed limbs to carry him, and that the handcuffs cut into his wrists during the transport.  The incident left Bell with bruises on his wrists, a swollen knee, and a swollen shoulder.

These injuries were relatively minor.  However, even though Bell's injuries fell on the lower end of the spectrum, a reasonable jury could still conclude that they demonstrate that the deputies used force against Bell.  The key question is whether a reasonable jury could find that the force was excessive.

### f.  *The Relationship Between the Need for Use of Force and the Amount of Force Used*

The foregoing factors inform the comparison between the amount of force needed and the amount of force used.

The need for force, which is determined by the security threat an officer would have reasonably perceived, must correspond to the amount of force used. *See Kingsley*, 576 U.S. at 397. Any efforts made to temper the force used weigh in favor of its reasonableness.

As discussed above, a reasonable jury could conclude that Bell posed a diminished security threat at the time of his cell extraction. Bell had calmed down and demonstrated he was willing to comply with Sergeant Williams' orders despite his initial hostility to moving cells. Even Sergeant Williams testified at trial that Bell was compliant. Once Bell was handcuffed and ready to move cells, most of the security concerns that Williams identified in her testimony had been mitigated.

A detainee's compliance reduces the need to use force against him. Under *Kingsley*, any "objectively unreasonable" amount of force used purposely or knowingly against a detainee violates the Fourteenth Amendment. 576 U.S. at 396–97. If a detainee is complying with orders, then *any* amount of unnecessary force is objectively unreasonable, even if the detainee previously disobeyed orders. Persisting in using force in such a situation would amount to punishment, and the Fourteenth Amendment's Due Process Clause prohibits punishing pre-trial detainees who have not yet been adjudged guilty. *See id.* at 397–98; *Bell v. Wolfish*, 441 U.S. 520, 535 (1979).

Other circuits have agreed that force may not be used against a compliant detainee even if the detainee initially disobeyed orders. *Piazza v. Jefferson County.*, 923 F.3d 947, 953 (11th Cir. 2019) ("Once a prisoner has *stopped resisting* there is no longer a need for force, so the use of force thereafter is disproportionate to the need." (internal

quotations omitted)); *Rowell v. Board of County Comm'rs of Muskogee County*, 978 F.3d 1165, 1173–74 (10th Cir. 2020) (holding that jail official did not use excessive force, but only after recognizing in a parenthetical that "the level of force necessary to gain compliance, but no more, is justified" (internal quotations omitted)); *cf. Aucoin v. Cupil*, 958 F.3d 379, 380 (5th Cir. 2020) (holding that under Eighth Amendment, "when a prison inmate engages in willful misconduct, a prison guard may use reasonable force to restrain him—but after the inmate submits, there is no need, and thus no justification, for the further use of force").

For example, in *Jacobs v. Cumberland County*, the Third Circuit affirmed a district court's denial of summary judgment to jail officials who allegedly punched Raheem Jacobs, a pre-trial detainee. 8 F.4th 187 (3d Cir. 2021). Jacobs had gotten into a fight with another detainee only fifteen minutes earlier, which the court found was "a type of jail disturbance." *Id.* at 195. But by the time the officers interacted with Jacobs, the situation had calmed down and Jacobs was "orderly and compliant." *Id.* The court held that a "reasonable factfinder could . . . conclude that Jacobs posed no threat throughout the encounter" because he was "defenseless and obeying orders." *Id.* Jacobs was compliant, so the need for force did not exist; "*any* additional force" would have been excessive. *Id.* at 196.

Similarly, Bell presented sufficient evidence at trial that any force used against him during the cell transfer was excessive. Even assuming that his initial resistance to moving cells created a disturbance warranting the use of force, evidence supported Bell's argument that he had resigned himself to moving cells and demonstrated complete compliance by the time Sergeant Williams began the cell

extraction.  When Bell's hostility dissipated, so too did the need for additional force.

In addition to the video evidence, Bell also put into evidence the sheriff's office's own policies.  The governing policy states that cell extractions should be used only as a last resort.   Regarding resistant detainees, the policy provides: "There shall never be a 'point of no return' from which the prisoner is no longer given an opportunity to comply with orders."   Even when a cell extraction is necessary,  the sheriff's department's policies instruct officers "to use the least amount of force necessary." Officers  should  use  no  more  force  than  "reasonably necessary to accomplish a sworn employee's lawful task."

In the context of a safety cell placement, cooperative detainees "should be allowed to walk to the safety cell."  The policy states explicitly that prisoners who refuse to walk may be transported in a "restraint chair or other mobile means (i.e., gurney, wheelchair, etc.)."   Only as "a last resort" should detainees be carried.

From this evidence, the jury could conclude that the force used against Bell in the cell extraction was objectively unreasonable.  The jail's policies instruct that there shall not be a "point of no return" from which a detainee is not given an opportunity to comply.  This policy applied to Bell in that he had initially resisted moving cells but, by the time the cell extraction began, was complying with orders. Despite Bell's compliance, which Williams agreed had manifested before force was used in the cell extraction, Williams proceeded with the cell extraction without accommodations for Bell's disability, apart from allowing two officers to support Bell on either side as he hopped between cells and then permitting the officers to carry Bell when he could hop no further.  This

decision contradicted the jail policy's instructions that detainees be given a final opportunity to comply before a cell extraction occurs and that there not be a "point of no return."

Williams' decision to commence the cell extraction without using a wheelchair or other assistive device resulted in Bell being carried by his arms and leg, a use of force that the jury could find unreasonable given the alternatives contemplated by the jail's policies. The safety cell policy identifies wheelchairs and gurneys as accommodations that should be used to transfer prisoners who refuse to walk. If these options are available to prisoners who *refuse* to walk, a jury could conclude that they should have been used for a detainee like Bell who *cannot* walk due to a disability.

Additionally, the jury could conclude that the force used was not required by exigent circumstances. Generally, courts defer to jail officials who make "split-second judgments" in situations that are "tense, uncertain, and rapidly evolving." *Kingsley*, 576 U.S. at 399 (quoting *Graham v. Connor*, 490 U.S. 386, 397 (1989)). Such was the case when Williams decided to order a cell extraction for Bell—evidence shows that she assessed Bell's hostility and determined in that moment that a cell extraction was needed to ensure the safety of everyone involved. But for at least two reasons, the deference we afford to Williams' decision to order the cell extraction is not owed to her decision in *how* the cell extraction should be performed. First, evidence shows that Williams' execution of the cell extraction violated jail policy. *Cf. Hope v. Pelzer*, 536 U.S. 730, 743–44 (2002) (denying qualified immunity in part because the defendant's actions violated internal regulations). She did not give Bell a last chance to comply with orders to move cells, and she did not use accommodations contemplated by jail policies. Second, Williams was not forced to make a

"split-second" decision as to how to perform the cell extraction. She had over forty minutes to develop a plan and to secure a suitable wheelchair or gurney that could accommodate Bell's disability.

Thus, the jury could reasonably find that Sergeant Williams ordered excessive force to be used against Bell by allowing him to be carried, rather than using an accommodation such as a wheelchair or gurney, during the cell transfer. This method of transportation injured Bell. Although those injuries were relatively minor, substantial evidence showed that they could have been avoided because Bell was compliant. It is reasonable to conclude that the failure to provide an accommodation in accord with the jail's policies resulted in the use of excessive force.

## 2. *Qualified Immunity for Sergeant Williams*

Sergeant Williams argues that even if substantial evidence supported the jury's verdict that she directed the use of excessive force against Bell, she is nevertheless entitled to qualified immunity because the unlawfulness of her actions had not been clearly established. We decline to reach this issue. The jury did not award Bell any damages against Williams, so it is not necessary for us to decide whether she is or is not entitled to qualified immunity. *See Hydrick v. Hunter*, 669 F.3d 937, 939–40 (9th Cir. 2012) ("Qualified immunity is only an immunity from a suit for money damages, and does not provide immunity from a suit seeking declaratory or injunctive relief."); *Crofton v. Roe*, 170 F.3d 957, 961 (9th Cir. 1999) ("Because we conclude that [the plaintiff] has not shown any damages stemming from [defendant prison's] ban on gift publications, we need not reach the qualified immunity issue.").

### 3.   *Monell Liability for the City*

Under 42 U.S.C. § 1983, the City is not liable for merely employing a jail official who commits a constitutional violation.  The Supreme Court held in *Monell v. New York City Department of Social Services*, 436 U.S. 658, 691–92 (1978), that § 1983 does not impose respondeat superior liability on municipalities.  The Court also recognized, though, that a municipality can be held liable when its own customs or policies cause a constitutional tort.  *Id.* at 694.

Establishing municipal liability based on a *Monell* theory of liability is difficult.  A plaintiff must show "a direct causal link between a municipal policy or custom and the alleged constitutional deprivation."  *City of Canton v. Harris*, 489 U.S. 378, 385 (1989).  One way of doing so is by showing that the municipality demonstrated deliberate indifference to constitutional rights when it trained its employees.  This requires "proof that a municipal actor disregarded a known or obvious consequence of his action."  *Connick v. Thompson*, 563 U.S. 51, 61 (2011) (quoting *Board of County Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 410 (1997)).

Bell alleged that the City failed to train its jail officers adequately in how to transport detainees with disabilities during cell extractions, and that this failure demonstrated the City's deliberate indifference to the known risks that could occur when transporting detainees with disabilities.  The jury found that Bell proved his allegations at trial and held the City liable for Williams' constitutional violation.  The City appeals this finding, arguing that Bell did not present sufficient evidence to prove his failure-to-train theory.

Whether the City can be held liable depends on whether and how well it trained its officers to treat detainees with

disabilities during cell extractions. San Francisco jail deputies are trained through a few different programs. First, all deputies graduate from an academy certified by the Commission on Peace Officer Standards and Training. In those courses, they receive training on use of force, the Americans with Disabilities Act, and the Rehabilitation Act. Deputies are instructed during this training that they have a duty to accommodate detainees' disabilities. After graduating from a police academy, deputies are trained further on the San Francisco Sheriff's Office's policies pertaining to cell extractions, safety cell placements, and use of force. Then, once assigned to a specific county jail, deputies receive additional site-specific training on cell extractions and safety cells, which may include further instruction on working with persons with physical disabilities. Finally, deputies participate in additional training programs every year, which sometimes touch on topics related to cell extractions and safety cell placements.

Williams and all the deputies who extracted Bell received the full regimen of this training program. Williams also completed additional training when she became a supervisor.

Bell nonetheless contends that this training was inadequate. Cell extractions and safety cell placements are frequent events in jails. The San Francisco Jail holds a significant number of people with physical disabilities, especially in the medical pod where Bell was detained. Given these facts, Bell argues, it was self-evident that detainees with mobility disabilities would be subjected to cell extractions and safety cell placements. Failure to train on this specific topic demonstrated deliberate indifference, according to Bell.

While we give deference to the jury's finding that Bell proved his allegations at trial, we hold that Bell's failure-to-train theory fails as a matter of law. Allowing the City to be held liable in this case would extend *Monell* liability far beyond the circumstances in which the Supreme Court has sanctioned it. Compare the facts of this case with the canonical failure-to-train example from *City of Canton v. Harris*. There, the Court assumed that a municipality could be held liable if it sent police officers into the streets without training them on when and how to use deadly force. 489 U.S. at 390 n.10. Deliberate indifference to such an obvious risk would satisfy the high standard for a failure-to-train theory of liability.

In contrast, San Francisco jail officers receive training at several stages of their careers on how to perform cell extractions and when to place detainees in safety cells. They also receive some degree of training on how to accommodate detainees with disabilities. We assume there was no training module focused directly on the overlap between those two topics, but the lack of such a distinct training module does not demonstrate deliberate indifference.

Far from resembling the *Canton* hypothetical, this case aligns more closely with *Connick v. Thompson*, where the Supreme Court rejected plaintiff Thompson's attempt to hold a municipality liable for its prosecutors' failure to turn over exculpatory evidence in a criminal proceeding against Thompson, resulting in Thompson spending eighteen undeserved years in prison. 563 U.S. at 54. The Supreme Court held that the municipality was not liable for its prosecutors' failure to comply with *Brady v. Maryland* because, despite any shortcomings in the municipality's training program, the prosecutors' legal education "equipped [them] with the tools to find, interpret, and apply legal

principles." *Connick*, 563 U.S. at 69–70. The prosecutors' general familiarity with the *Brady* rule distinguished Thompson's case from *Canton*, where the hypothetical armed police officers were given no training on the constitutional limits of deadly force. *Id.* at 67, 69–70.

As in *Connick*, the training program for jail officers in this case covered the relevant topics with reasonable specificity. With the benefit of hindsight, we can poke holes in the training program and find areas that might deserve greater attention, especially in a case like this where cell extractions are performed routinely in a pod with many disabled detainees. But those narrow gaps do not demonstrate deliberate indifference to a known risk. In constructing the training program, the City could reasonably expect jail officers to connect the dots between different training modules when those subjects intersect in real-world situations. Thus, the City's training program does not demonstrate deliberate indifference to a known risk under the "most tenuous" theory of *Monell* liability. *See Connick*, 563 U.S. at 61. We reverse the district court's decision denying the City's motion for judgment as a matter of law as to Bell's *Monell* claim based on excessive force.

### B. *Americans with Disabilities Act and Rehabilitation Act Claims*

Bell alleged that the City discriminated against him when Williams refused to provide him an accommodation for his disability during the cell extraction. The discriminatory actions allegedly denied Bell the benefit of a program, activity, or service within the jail—namely, appropriate

means of transferring between cells—in violation of the Americans with Disabilities Act and Rehabilitation Act.[1]

The City makes three arguments for judgment as a matter of law on these claims. First, the City argues that a single instance of alleged discrimination did not deny Bell the benefits of a governmental service, program, or activity. This argument defies precedent.

Transporting detainees to safety cells is a normal government function. It occurs "very frequently," and the City has formal policies in place governing the use of safety cells and cell extractions. For decades, we have declined to make "hair-splitting" distinctions in determining which government functions fall within the "services, programs, or activities" covered by the ADA and Rehabilitation Act. *Barden v. City of Sacramento*, 292 F.3d 1073, 1076 (9th Cir. 2002). Instead, we have held that all normal functions of a government entity are covered. *Id.* Under our precedent, transporting detainees to safety cells is a function covered by the ADA and Rehabilitation Act.

The City cites a single Seventh Circuit case, *Foley v. City of Lafayette*, for the proposition that "[i]solated acts of negligence by a city employee do not come within the ambit of discrimination against disabled persons proscribed by the ADA." 359 F.3d 925, 930–31 (7th Cir. 2004). The facts of *Foley* show why its language does not apply to this case. Foley used a wheelchair and allegedly suffered frostbite because he had to wait outside in extremely cold weather for

---

[1] The Rehabilitation Act applies only to entities that receive federal funding. *See* 29 U.S.C. § 794. At one point in the district court, the City disputed whether it received sufficient federal funding to be covered by the Rehabilitation Act. The City does not raise that issue on appeal, so we assume that the Rehabilitation Act applies to the City.

too long while leaving a train station. *Id.* at 926–28. Foley had planned to use the train station's elevator, but it was broken temporarily due in part to the cold weather. *Id.* at 926–27. Foley was forced to walk slowly up a staircase with help from a city employee, exposing him to the freezing temperatures. *Id.* at 928. The Seventh Circuit affirmed summary judgment for the defendants. *Id.* at 926. It reasoned that abnormal weather conditions rendered the city's usual accommodations temporarily ineffective. *Id.* at 930. To the extent that the city employee should have found a warmer place for Foley to wait instead of just helping him up the stairs, the employee's actions amounted to "at worst, individual, isolated instances of employee negligence and not a systemic problem" in the City's policies or practices. *Id.* The Seventh Circuit held that such negligence by an employee was beyond the scope of the Americans with Disabilities Act and Rehabilitation Act. *Id.* at 930–31.

Where *Foley* involved at most an isolated act of negligence committed by a city employee amidst unusual circumstances, this case focuses on a deliberate choice that Williams made while facilitating a function that occurs in the ordinary course of her job: cell transfers. Plucking one sentence from an opinion involving inapposite facts does not help the City's cause.

In any event, this court has not embraced the reasoning of *Foley*. We have recognized that a single instance of discrimination *can* support a disability discrimination claim under either the ADA or Rehabilitation Act. *E.g.*, *Vos v. City of Newport Beach*, 892 F.3d 1024, 1037 (9th Cir. 2018) (reversing summary judgment for defendants where ADA and Rehabilitation Act claims stemmed from single instance of alleged disability discrimination by police); *Cohen v. City of Culver City*, 754 F.3d 690, 694–701 (9th Cir. 2014)

(reversing summary judgment for defendants where a plaintiff with mobility disabilities was denied curb access one time by a vendor's display blocking the curb ramp); *Fortyune v. American Multi-Cinema, Inc.*, 364 F.3d 1075, 1078, 1085 (9th Cir. 2004) (holding that plaintiff stated an ADA claim by alleging that movie theater denied him accessible seating at a single viewing of a movie). Because we have rejected the premise that single instances of disability discrimination cannot establish ADA or Rehabilitation Act claims, we reject the City's argument relying on the Seventh Circuit's decision in *Foley*.

The City's second and third arguments are related. The City contends that Bell's proposed accommodations—using his wheelchair or prosthetic leg during the cell extraction—were unreasonable under the circumstances. The City also argues that even if these accommodations were reasonable, declining to offer them was lawful because it was "rationally related" to maintaining security and order in the jail. Both arguments fail, at least as a matter of law.

Jail medical staff prescribed for Bell the wheelchair and prosthetic leg, so they are obviously reasonable accommodations for transportation within the jail under normal circumstances. Granted, a cell extraction with a non-compliant detainee poses special security risks, but Bell was not a non-compliant detainee. And, even if he had been, the jail's own cell extraction policy contemplates using a wheelchair to transport detainees who refuse to walk. As noted before, if the jail permits wheelchairs for detainees who *refuse* to walk, the jury could find it reasonable for the jail to provide a wheelchair for a detainee who *cannot* walk. To the extent that Williams was concerned that Bell's own wheelchair might harbor a concealed weapon, she had plenty

of time before the cell extraction to find a different wheelchair or a gurney.

Finally, the City's arguments grounded in *Turner* deference are misplaced. In *Turner v. Safley*, 482 U.S. 78 (1987), the Supreme Court held that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Id.* at 89. This deference might apply if Bell were challenging a regulation that prohibited him from using a wheelchair during cell extractions. But Bell is asking for the jail to comply with its existing regulations. To give those regulations deference would only further support Bell's position. Because Bell is not challenging a jail policy, *Turner* deference does not apply. *See Byrd v. Maricopa County Sheriff's Dep't*, 629 F.3d 1135, 1141 n.6 (9th Cir. 2011) (en banc) (declining to apply *Turner* deference because plaintiff challenged an individual officer's conduct rather than a governmental policy).

Jail staff must often make difficult calls in tense and fast-evolving situations, and courts owe them considerable deference in such cases. This is not one of those cases. Williams had over forty minutes after she decided to perform a cell extraction to obtain a wheelchair, gurney, or other mobility device that would accommodate Bell's disability. Jail policies provided for just such accommodations. The jury could find that reasonable accommodations existed to assist Bell in transiting between the two cells even in light of the jail's legitimate security interests. The district court did not err in upholding the verdict on this issue.

C. *Jury Instructions*

The district court instructed the jury on Bell's ADA and Rehabilitation Act claims:

> It is for you to determine whether an accommodation is reasonable. When determining whether a given accommodation is reasonable, you must consider a detention facility's legitimate correctional interests, and whether there is a valid, rational connection between the action taken and the legitimate and neutral governmental interest put forward to justify it.

The City objected to this instruction, arguing that it did not adequately inform the jury about the deference owed to the jail's security interests. The City renews its objection on appeal.

The City essentially argues that the jury should have been told twice to defer. First, the jury was instructed that Bell needed to show that his proposed modifications were reasonable given the City's legitimate interests in security. Second, according to the City, the jury should have been instructed that it could not rule in Bell's favor unless he showed that the action taken—not providing him a wheelchair during the cell extraction and transfer—was not "reasonably related to the [jail's] legitimate interests." *See Pierce v. County of Orange*, 526 F.3d 1190, 1216 (9th Cir. 2008) (citing *Turner*, 482 U.S. at 89). The City claims that the district court erred by omitting this second portion from the jury instructions.

We review de novo whether civil jury instructions substantively misstated the law if the challenge was preserved. *Chess v. Dovey*, 790 F.3d 961, 970 (9th Cir. 2015). The district court's jury instructions correctly stated the law here. The *Turner* deference the City relies upon applies only where a prisoner challenges a prison regulation. *See Turner*, 482 U.S. at 89 ("[W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests."). Bell is not *challenging* a jail regulation. He complains about Williams' *failure to comply* with the jail regulation, which permits wheelchairs to be used during cell extractions. The district court did not err in declining to include the *Turner* test in the jury instructions.

Even though the *Turner* standard does not apply here, consideration of the jail's security interest is still relevant in determining what counts as a reasonable accommodation. The district court properly recognized this point in its jury instructions by telling the jury to "consider a detention facility's legitimate correctional interests, and whether there is a valid, rational connection between the action taken and the legitimate and neutral governmental interest put forward to justify it." In sum, we affirm the City's liability for violating the ADA and Rehabilitation Act.

D. *Damages Award*

The jury awarded Bell $504,000 in compensatory damages. The jury did not apportion the award among claims or different forms of compensatory damages. The City challenges the award on two grounds. First, it argues that Bell could not recover mental or emotional damages because he did not suffer a sufficient physical injury as

required by 42 U.S.C. § 1997e(e).**²**   Second, the City
contends that Bell's damages award was grossly excessive
and must be vacated.  We reject the first challenge but agree
with the second.

### 1. *The Physical Injury Requirement in 42 U.S.C. § 1997e(e)*

The Prison Litigation Reform Act of 1996 requires an
incarcerated plaintiff (whether already convicted or a pretrial
detainee like Bell) to prove a "physical injury" as a condition
of recovering compensatory damages for mental or
emotional harms.  42 U.S.C. § 1997e(e).  The law does not
require a prisoner to suffer a "significant" physical injury.
*Oliver v. Keller*, 289 F.3d 623, 627–28 (9th Cir. 2002).
Rather, the injury need only be more than *de minimis*.  *Id.*
To satisfy § 1997e(e)'s physical injury requirement, a
prisoner need not suffer an injury that is observable, requires
a diagnosis, or demands medical treatment.  *Id.* at 628.
Otherwise, callous jail guards could get away with inflicting
excessive force by devising innovative ways to commit
battery without leaving a mark.  *Cf. Hudson v. McMillian*,
503 U.S. 1, 9 (1992) (violation of Eighth Amendment does
not require significant injury to be "evident;" otherwise it
would "permit any physical punishment, no matter how

---

[2] Damages for emotional distress are not available under the
Rehabilitation Act.  *Cummings v. Premier Rehab Keller, PLLC*, 596 U.S.
212, 230 (2022).  Whether emotional distress damages are available
under Title II of the ADA after *Cummings* is an open question in this
Circuit.  But because the City did not make this argument before the
district court or on appeal, the City has forfeited any argument that
emotional distress damages are not available under Title II of the ADA.
*See United States v. Carlson*, 900 F.2d 1346, 1349 (9th Cir. 1990); *Miller
v. Fairchild Indus., Inc.*, 797 F.2d 727, 738 (9th Cir. 1986).

diabolic or inhuman" so long as it inflicted "less than some arbitrary quantity of injury").

To recount the injuries Bell suffered: Bell testified that Sergeant Williams forced him to hop on his one leg, which his doctor had advised him not to do, and ordered him to be carried by his handcuffed arms and left leg. Because of this, Bell endured pain in his hips, knee, ankle, and back. He described the pain as 9.5 on a 10-point scale. Bell testified that he saw abrasions on his wrists, heard his shoulder pop, and observed bruising on his wrists and swelling around his knee and shoulder after the incident.

Bell suffered physical harm, as the jury found. He introduced evidence from which the jury could find that visible marks were left on his skin, and that he felt pain both during the cell extraction and for days afterward. He heard his shoulder pop. These physical injuries satisfy the "physical injury" requirement of § 1997e(e). *See, e.g.*, *Pierce*, 526 F.3d at 1224 (bed sores and bladder infections qualified as physical injuries under § 1997e(e)); *Munn v. Toney*, 433 F.3d 1087, 1089 (8th Cir. 2006) (headaches, cramps, nosebleeds, and dizziness qualified as physical injuries under § 1997e(e)); *Lawson v. Hall*, No. 2:07-00334, 2008 WL 793635, at *5–7 (S.D. W. Va. Mar. 24, 2008) (§ 1997e(e) did not require dismissal of plaintiff-prisoner's claim where he alleged only "severe pain" from being kneed in his genitals); *Mansoori v. Shaw*, No. 99 C 6155, 2002 WL 1400300, at *1, *4 (N.D. Ill. June 28, 2002) (§ 1997e(e) did not bar claim for mental and emotional damages where plaintiff had "tenderness and slight swelling" but no visible bruises or abrasions after suffering a "chest wall injury" from punches); *Romaine v. Rawson*, 140 F. Supp. 2d 204, 210, 214 (N.D.N.Y. 2001) (holding "minor" injuries resulting from three slaps to the face satisfied § 1997e(e)).

These cases holding that injuries like abrasions, bruises, and pain qualify as physical injuries within the meaning of § 1997e(e) are consistent with the plain language of the statute. They are also consistent with similar provisions in other statutes where Congress has defined "bodily injury" to include "a cut, abrasion, bruise, burn, or disfigurement," "physical pain," and "any other injury to the body, no matter how temporary." *See, e.g.*, 18 U.S.C. § 831(g)(5) (prohibited acts involving nuclear materials); *id.* § 1365(h)(4) (tampering with consumer products); *id.* § 1515(a)(5) (definitions for obstruction of justice or other official proceedings); *id.* § 1864(d)(2) (hazardous or injurious devices on federal lands). We recognize that Congress chose to use the term "physical injury" rather than "bodily injury" in § 1997e(e), but we do not see any daylight between those two terms. At the very least, the fact that Congress deemed cuts, abrasions, and bruises to qualify as "bodily injuries" under other statutes tends to confirm that such injuries count as "physical injuries" under § 1997e(e).

Bell presented evidence showing that the injuries he suffered satisfy the § 1997e(e) standard. His injuries were not severe, but they were physical injuries inflicted by the excessive force that Sergeant Williams ordered. The cell extraction left him in pain for several days with abrasions and bruises. We conclude Bell's injuries were more than *de minimis*, so § 1997e(e) does not foreclose an award of reasonable damages for Bell's mental and emotional suffering.

### 2. *Grossly Excessive Award*

The City argues that the $504,000 award is grossly excessive for the harm Bell suffered during his cell

extraction. The City asks us to vacate the award and to order a remittitur or a new trial.

The jury did not apportion its damages award between the amounts meant to compensate Bell for his physical injuries, emotional distress, and pain and suffering. Still, the bulk of the award must be attributed to Bell's emotional distress and pain and suffering. His physical injuries, though more than *de minimis*, were not severe enough to support more than a small fraction of the damages award. Bell's injuries did not require medical care or leave consequences lasting more than a few days. He did not present evidence that the cell extraction caused him long-term physical impairments. The temporary and relatively minor nature of his physical injuries compels the conclusion that they could not support compensatory damages on the scale of this verdict.

So in determining whether a remittitur is appropriate, we must consider whether the evidence pertaining to Bell's emotional distress and pain and suffering can sustain the high damages award.

a. *Remittitur on Emotional Damages Awards*

We review for abuse of discretion the district court's decision to deny remittitur and a new trial. *Gasperini v. Center for Humanities, Inc.*, 518 U.S. 415, 436, 438 (1996). The jury's verdict must be upheld unless the amount is "grossly excessive or monstrous, clearly not supported by the evidence, or based only on speculation or guesswork." *Harper*, 533 F.3d at 1028 (quoting *Del Monte Dunes at Monterey, Ltd. v. City of Monterey*, 95 F.3d 1422, 1435 (9th Cir. 1996)). In this deferential review, we give the trial court "the benefit of every doubt" and reverse only where a damages award exceeds its reasonable bounds. *Gasperini*,

518 U.S. at 435 (quoting *Dagnello v. Long Island R.R. Co.*, 289 F.2d 797, 806 (2d Cir. 1961)).  Despite the significant deference we give to the jury and the district court in weighing the evidence, we agree with the City that this damages award is grossly excessive and unsupported by the evidence.

This court has no precedent expressly ordering a remittitur of a compensatory damages award based on emotional distress.[3]  But the Supreme Court has recognized an appellate court's authority to order remittitur of compensatory damages, *see id.* at 439, and other circuits have often recognized that an appellate court may need to order remittitur to correct excessive awards for emotional distress. *See, e.g.*, *Trainor v. HEI Hosp., LLC*, 699 F.3d 19, 32–33 (1st Cir. 2012) (after district court ordered remittitur of emotional damages from $1,000,000 to $500,000, First Circuit gave plaintiff choice between further reduction to $200,000 or new trial); *Stampf v. Long Island R.R. Co.*, 761 F.3d 192, 206–08 (2d Cir. 2014) (reversing denial of remittitur of $200,000 jury award for past emotional distress and giving plaintiff choice between $100,000 or new trial); *Sloane v. Equifax Info. Servs., LLC*, 510 F.3d 495, 502–07 (4th Cir. 2007) (reversing denial of remittitur of $245,000 jury award for emotional distress and giving plaintiff choice between $150,000 or new trial); *Thomas v. Texas Dep't of Crim. Just.*, 297 F.3d 361, 367–72 (5th Cir. 2002) (ordering remittitur for $100,000 jury award for future emotional damages and giving plaintiff choice between $75,000 or new trial); *Townsend v. Bayer Corp.*, 774 F.3d 446, 466–67 (8th

---

[3] We ordered a remittitur based on excessive emotional damages in a non-precedential memorandum disposition in *Cosby v. AutoZone, Inc.*, 445 F. App'x 914 (9th Cir. 2011).

Cir. 2014) (reversing denial of motion for remittitur on $568,000 jury award on emotional damages and giving plaintiff choice between $300,000 or new trial). As with any other damages award, awards for emotional distress can be excessive. There "must be an upper limit" to every damages award. *Gasperini*, 518 U.S. at 435 (quoting *Dagnello*, 289 F.2d at 806). Otherwise, if left unrestrained, compensatory damages awards could go beyond their compensatory function and turn punitive. *See Planned Parenthood of Columbia/Willamette Inc. v. American Coalition of Life Activists*, 422 F.3d 949, 953 (9th Cir. 2005). Locating the upper limit is a question of law, not fact, and is subject to appellate review. *Gasperini*, 518 U.S. at 435.[4]

Courts consider several factors in determining when an award is grossly excessive. Two are particularly relevant. First, because damages awards, especially emotional distress damages award, are fact-dependent, we consider the evidence presented at trial. Evidence supporting an

---

[4] In *Zhang v. American Gem Seafoods, Inc.*, we rejected the appellants' argument that "emotional distress damages must be supported by substantial evidence." 339 F.3d 1020, 1040 (9th Cir. 2003). We cited our holding in *Passantino v. Johnson & Johnson Consumers Prods., Inc.*, 212 F.3d 493, 513 (9th Cir. 2000), that objective evidence is not needed to support a damages award based on emotional distress; a plaintiff's testimony alone is enough. *Zhang*, 339 F.3d at 1040. Despite its broad language, we take the *Zhang* statement to mean only that emotional damages need not be supported by substantial *objective* evidence. We do not take this statement to except emotional damages from ordinary appellate review, which is deferential but requires jury awards to be supported by substantial evidence. *Harper*, 533 F.3d at 1028. Otherwise, massive damages awards could be supported by only the slightest testimonial evidence. We have continued to determine the excessiveness of emotional damages by asking whether the award went against "the clear weight of the evidence," even after *Zhang*. *E.g.*, *Tortu v. Las Vegas Metro. Police Dep't*, 556 F.3d 1075, 1087 (9th Cir. 2009).

emotional damages award may consist of nothing more than oral testimony. *Zhang v. American Gem Seafoods, Inc.*, 339 F.3d 1020, 1040 (9th Cir. 2003) (citing *Passantino v. Johnson & Johnson Consumer Prods., Inc.*, 212 F.3d 493, 513 (9th Cir. 2000)). Other evidence may also be relevant, including related economic damages such as loss of income and documentation of medical treatment or conditions caused by the distress; impairment of reputation; and physical injuries caused by the distress. *See Tortu v. Las Vegas Metro. Police Dep't*, 556 F.3d 1075, 1086 (9th Cir. 2009) (jury's emotional damages award based on medical bills, physical pain, and job loss); *Stampf*, 761 F.3d at 208 (noting that diagnosis for mental or emotional disorder would justify higher emotional damages award); *Sloane*, 510 F.3d at 503 (listing multiple factors to consider, including medical evidence and loss of income).

Second, we can consider awards in comparable cases, though, in an area as subjective and difficult to quantify as emotional damages, courts must exercise caution when comparing damages awards between cases. Even if two cases appear factually similar, the strength of evidence presented at trial may vary in ways impossible to fully appreciate on appellate review. *See Osterhout v. Board of County Comm'rs of LeFlore County*, 10 F.4th 978, 999 (10th Cir. 2021) (warning courts against comparing cases). Nevertheless, awards in previous cases that are "similar enough to serve as a meaningful benchmark" may provide insight in determining whether an award was within reasonable bounds. *Id.* (quoting *Hill v. J.B. Hunt Transport, Inc.*, 815 F.3d 651, 671 (10th Cir. 2016)).

We emphasize that the evidence presented at trial should be given foremost priority in assessing the reasonableness of a damages award. If the evidence is sufficient to support

even a high award, there is no need to compare cases. *See Harper*, 533 F.3d at 1028–30 (upholding compensatory damages award based on testimony alone without comparing cases); *Zhang*, 339 F.3d at 1039–41 (same); *Adams v. City of Chicago*, 798 F.3d 539, 545 (7th Cir. 2015) (reversing grant of remittitur; comparing other cases only after reviewing evidence in record). In this way, we do not restrain the effects of social change on damages awards. Whether due to inflation or changing attitudes toward certain types of official misconduct, a damages award based on emotional distress can be substantial if a plaintiff presents sufficient evidence to support it.

### b. *Remittitur in This Case*

The City argues that a remittitur is needed here. Simply put, it argues that Bell's two-minute experience transitioning between cells, which did not leave lasting pain or impairments or even require medical care, cannot sustain an award of $504,000. The City contends that such a high award is far beyond any reasonable valuation of the pain and suffering Bell could have endured during the cell transfer, at least based on the evidence presented at trial. Even giving due deference to the jury and district court, we agree.

### i. *Did Substantial Evidence Support the Damages Award?*

In denying the City's motion for remittitur or a new trial, the district court relied primarily on *Webb v. Ackerman*, No. CV 13-9112-PLA, 2017 WL 5665001 (C.D. Cal. Sept. 26, 2017). In that case, plaintiff Ray Webb sued police for striking him with a baton and flashlight twenty-one times, using a carotid hold four times, and tasing him repeatedly. *Id.* at *2. The jury awarded Webb $600,000 in compensatory damages. *Id.* The district court in *Webb*

denied remittitur, finding that Webb had sustained serious injuries and lasting psychological effects. *Id.* at *8. Webb was hospitalized for a day, bore bruises and cuts all over his body, and continued to suffer from significant anxiety after the assault. *Id.* The defendants did not appeal the trial judge's decision in *Webb*.

In Bell's case, the district court found *Webb* instructive, as it involved a similarly high damages award in an excessive force case. In its written order denying remittitur or a new trial, the district court summarized the facts supporting the award:

> Bell testified that he experienced severe pain in his ankle, knee, hip and back, swelling in his knee and shoulder, bruising on his wrists, that he heard his shoulder pop, that the handcuffs cut into his wrists when he was carried in a strappado fashion, and that the incident exacerbated his preexisting injuries, including those due to multiple gunshot wounds.

Bell's testimony certainly supports *some* amount of damages for emotional distress and pain and suffering. The jury could credit Bell's testimony and determine that he should be compensated for the physical pain and emotional anguish he felt during and after the cell extraction.

Neither side contests that the bulk of Bell's damages award must have been based on emotional distress and pain and suffering. Recall that Bell presented evidence to this effect from which a reasonable jury could conclude he is entitled to a quantum of compensatory damages. He rated his pain as 9.5 out of 10, and he testified that he felt degraded

during the experience. But all told, the transport between cells lasted less than two minutes. The part that caused the most physical pain—being carried by his arms and left leg— lasted even less than that. Bell did not testify that he suffers long-term psychological effects, such as nightmares or a recurring fear of the incident repeating itself. And he did not suffer lasting pain. At most, he had to endure pain for a few days while his minor physical injuries healed.

We cannot know exactly what motivated the jury's award, and that is not the question before us.[5] The issue is

---

[5] We can speculate about at least two possible explanations, but neither would actually support the verdict. First, the unusual number $504,000 echoes Section 504 of the Rehabilitation Act. The jury was given written instructions detailing the elements of Bell's Rehabilitation Act claim, which instructions included multiple references to the pertinent section of that Act, Section 504. The section number of the Rehabilitation Act bears no relationship to an appropriate amount of damages here, but neither does the evidence offer any other explanation for that specific number. Second, it is possible that the jury's excessive award might have been based in part on Bell's testimony about the conditions of the safety cell. In his words, Bell experienced "disgusting" and "demoralizing" conditions in the safety cell. He was left naked and, because of his disability, was supposed to relieve himself using a grate in the floor. Bell described to the jury how, because of his disability, he was forced to get down on his one knee and place a hand on the floor in order to urinate into the grate. His disability prevented him from defecating into the grate because he could not squat over the hole in the floor, and jail staff refused to bring him a portable toilet. Bell had initially brought a conditions of confinement claim based on these allegations. The district court dismissed that claim for failure to exhaust administrative remedies, but the court admitted Bell's testimony as relevant to his due process claim. Bell ultimately lost on this claim at trial. So to the extent that this testimonial evidence might explain how the jury reached its exorbitant figure, it cannot prevent remittitur. The evidence has no relevance to Bell's excessive force claim or his disability discrimination claims

the maximum amount that would fairly compensate Bell for the emotional distress and pain and suffering he endured during a brief cell transfer that did not leave lasting physical or emotional damage. Bell did not submit evidence showing why his experience was deserving of such an exceptional award. We reiterate that testimony alone can support compensatory damages for emotional distress and pain and suffering. *Zhang*, 339 F.3d at 1040. But exceptional damages awards require substantial evidence, whether it comes in the form of detailed testimony or other supporting documentation. That evidence is missing here, so we conclude that the damages award is grossly excessive.

### ii. Comparing Bell's Damages Award Against Other Cases

Though the excessiveness of a damages award is determined by assessing the evidence presented at trial, our conclusion as to the excessiveness of Bell's damages award is confirmed by comparing his compensatory damages award against those from other cases. In *Webb v. Ackerman*, the case relied upon by the district court, the plaintiff experienced much greater force that caused him to lose consciousness and be hospitalized. 2017 WL 5665001, at *2, *8. He also testified to long-term emotional effects from the incident. *Id.* at *8.[6] None of those factors is present in Bell's case. Bell endured a lesser degree of force and suffered less severe injuries. He did not require medical care or suffer long-term consequences as a result of his cell extraction. Even if we treated the district court decision in

_____

(which pertained only to inadequate accommodations during his cell transfer), so it cannot support a damages award based on those claims.

[6] The parties in *Webb* disputed the facts of what happened. For purposes of this appeal, we accept the plaintiff's version of the facts.

*Webb* as authoritative, it thus suggests this award is excessive. A compensatory damages award above half a million dollars demands much more evidence of pain and/or greater emotional anguish to be sustainable.

We have searched for cases in which an appellate court affirmed a comparable damages award on similar facts. We were unable to find any, and Bell did not bring any to our attention. Nor did we find any comparable district court cases. The case that comes closest to supporting Bell's high damages award is an unappealed trial court decision in *Cervantes v. County of Los Angeles*, No. 12-cv-9889, 2015 WL 5163031 (C.D. Cal. Sept. 3, 2015). A jury awarded Eduardo Cervantes $900,000 after two sheriffs punched him in the face, tackled him to the ground, and took him to jail. *Id.* at *1–2. Cervantes went to a doctor to be treated for a swollen eye, contusions, and abrasions; he was prescribed 800 milligrams of ibuprofen. *Id.* Though these physical injuries were minor in the short-term, the evidence in that case showed that they had long-term effects: Cervantes testified that he continued to suffer headaches, eye pain, and had "floaters" in his vision since the incident. *Id.* In terms of emotional distress, Cervantes testified that he still had trouble sleeping because he had nightmares of police killing him. *Id.* at *1. He also said he felt nervous about going out in public because he feared being pulled over and assaulted again. *Id.* Finally, Cervantes mentioned that it was painful to tell his family that he went to jail. *Id.* The defendants moved for a remittitur and the district court granted it, giving Cervantes the option between remitting the award to $500,000 or a new trial. *Id.* at *3.

Cervantes' case shares some similarities with Bell's, but it is also different in at least one significant way. In asking the jury to award $900,000 during his closing argument,

Cervantes' lawyer argued that nearly half that amount was to compensate Cervantes for future pain and suffering. *Id.* at \*1. That request was supported to some degree by evidence showing that Cervantes was likely to suffer pain and emotional distress in the future. Bell, however, did not submit similar evidence. Thus, although the dollar amounts between the two awards ended up about equal, they are not an apples-to-apples comparison. While a plaintiff need not identify a comparable case to avoid remittitur, the absence of a comparable case confirms our conclusion that substantial evidence did not support the award here.

### iii.  Remittitur or New Trial

In sum, based on the trial record and the district court's explanation in denying the City's motion for remittitur or a new trial, the jury's compensatory damages award of $504,000 is grossly excessive and cannot be sustained.

We have occasionally set the remittitur amount where objective evidence clearly identified the correct damages amount. *See, e.g.*, *Unicolors, Inc. v. H&M Hennes & Mauritz, L.P.*, 52 F.4th 1054, 1086–89 (9th Cir. 2022) (correcting the district court's remittitur calculation in copyright suit by using the gross profit per piece, rather than the average gross sales price per piece, in determining the profit-disgorgement amount); *Oracle Corp. v. SAP AG*, 765 F.3d 1081, 1094–95 (9th Cir. 2014) (concluding that the district court selected the incorrect lost-profits amount when setting the remittitur in copyright infringement case involving computer software). Here, we lack such an objective measure. We therefore remand this case to the district court to give Bell the option between a remittitur or a new trial. While the district court has discretion to set the exact remittitur amount, we find it difficult to conceive that

Bell's emotional distress and pain and suffering could be valued reasonably anywhere above $150,000.

### E. *Injunctive Relief*

At oral argument, the City abandoned its challenge to the district court's injunction as overbroad. We express no opinion on the issue.

### V. *Conclusion*

For the reasons we have explained, we affirm the district court's decisions that Williams violated Bell's Fourteenth Amendment right against excessive force and that the City violated the ADA and the Rehabilitation Act. The district court also did not err in its jury instructions on Bell's ADA and Rehabilitation Act claims. We reverse the district court's decision on Bell's failure-to-train theory of *Monell* liability and the compensatory damages award. We vacate the judgment and remand the case to the district court. The district court shall give Bell the option of choosing between a new trial on damages on his ADA and Rehabilitation Act claims or a remittitur in an amount to be determined by the district court consistent with this opinion.

**AFFIRMED IN PART, REVERSED IN PART, VACATED and REMANDED.**